NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

JOY RECOVERY TECHNOLOGY CORP., Respondent.

No. 97–2001.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1997.

Decided Jan. 26, 1998.

Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, Aileen A. Armstrong, William M. Bernstein (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner.

John J. Toomey, Arnold & Kadjan, Chicago, IL, Donald W. Anderson (argued), Daniel V. Kinsella, Burditt & Radzius, Chicago, IL, for Respondent.

Before KANNE, ROVNER, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order requiring the Joy Recovery Technology Corporation to reinstate its transportation department and to bargain with Local 673 of the International Brotherhood of Teamsters.

The NLRB determined that Joy violated Section 8(a)(1) of the Labor Management Relations Act (29 U.S.C. § 158(a)(1)) by interrogating employees, soliciting surveillance of union activities, and threatening employees with layoff if they selected the union as their bargaining representative; that the company violated Section 8(a)(3)(i) of the Act by the discriminatory discipline of employee Edward Kizior for union activity and the unlawful closing of its transportation department and the termination of the employees, all at its facility in Aurora, Illinois. The Board ordered the company to cease and desist from the unfair labor practices, to reestablish its transportation department as it previously existed, to reinstate employees unlawfully terminated, to expunge from its files references to the unlawful suspensions, and to post copies of a remedial notice. In addition, the Board entered a bargaining order, pursuant to *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

Joy is involved in the reclamation and recycling of scrap wire and other materials for Ameritech, its only customer. Ameritech retains title to the scrap up to the point of resale. Up until the events of this case, Joy maintained a transportation department and transported the scrap using its own employees and equipment, as well as contracting with independent carriers. The transportation department had nine employees.

In late May 1994 transportation department driver Ed Kizior contacted Robert "Ace" Warren, a Teamsters representative, to find out about obtaining union representation. Kizior arranged for a meeting between Warren and the employees on July 9, 1994. The employees, who were present, signed union authorization cards, and on July 11 the union filed a petition seeking certification. On July 13 Joy received formal notice that the petition had been filed.

On August 5 Kizior received a written warning stating that he and employee Jose Lopez had taken a company truck without prior authorization and that he would be suspended for 3 days without pay. He claims the use of the truck was authorized to take Lopez to his drivers license exam.

By August 11 Joy distributed a memo to employees saying that the transportation department had caused financial losses to the company, that it would be closed, and that the company would rely on contracts with common carriers, effective August 22. On August 12 the company wrote the union, informing it of the above and that it would be notifying its drivers of the decision to terminate their employment.

The Board found that during July—the time when the employees were meeting with union representatives—the company engaged in inappropriate conversations with employees. Company manager Mark Matza asked employee Michael Watson which employees had signed union cards. Watson said he did not know. Matza reportedly told Watson that "[s]omething is going to have to be done" because he did not want it [apparently referring to the union] to "spread throughout the whole plant." During mid-July company supervisor Roberto Baltazar asked Lopez (the employee involved in the truck incident) if he knew anything about the union and which employees had signed union cards. Lopez lied and said he did not. Baltazar also wanted to know if anyone had asked Lopez to sign a card and whether he knew who the head of the union was. Baltazar reportedly told Lopez that they did not need a union at the company.

In addition, the Board found that manager Matza discussed the transportation department with Julia Chandler, a dispatcher for the department. Matza told Chandler that he was interested in knowing who had contacted the union. He asked if it was Kizior, but Chandler refused to say. Matza then asked if it was Dave Woodard, who, Matza said, had previously mentioned "getting a union in there." Matza asked Chandler whether there was anything that the company could offer the employees to "make them not seek representation." He also asked her where the union meetings were held, who attended them, and whether she could obtain copies of union literature. Incredibly, he asked her to take a tape recorder into a meeting to surreptitiously record it. Matza asked Chandler's opinion of closing the transportation department. This was the first time she had heard anything about closing the department, and she asked if the union had anything to do with the company's having the idea to close it. He said that the union "did play a major part" in the decision.

Other findings include that general manager Simon Pawlenko also discussed the union with Chandler, telling her he thought she had brought the union in. He subsequently told her to use more outside carriers for transporting scrap to Joy's facilities.

The company had always used some outside carriers, and maintaining its transportation department had been troublesome because the operation was small and inefficient. In fact, Ameritech complained about the transportation services Joy provided. On July 29, 1994, Ameritech wrote to Matza and pointed out that there had been dissatisfaction with scrap pickups and that Ameritech would continue to allow Joy to handle the transportation of scrap for 30 days, but if by September 1 there was not significant improvement, Ameritech would put into place alternative transportation processes.

Sometime in late 1993 or early 1994, before the union activity began, the company talked with James Bowman about the problems in the department, and he was hired to do a study. There is a dispute as to the purpose of the study. The employees who testified at the hearing in this matter said that when Bowman spoke with them, he asked ques-

tions regarding how to improve the department. Joy, on the other hand, said he was hired to do a distribution study to determine alternatives to the department. The NLRB found that the original purpose of hiring Bowman was to study how to improve the department; the company wanted to continue to transport some of the materials itself to avoid making it easy for Ameritech to send materials elsewhere. Nevertheless, the company used the Bowman study to justify a decision to close the department.

■ Our review of the NLRB's order is limited. We uphold the factual findings if they are supported by substantial evidence in the record as a whole and we uphold the legal conclusions if they have a reasonable basis in the law. *NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506 (7th Cir.1991). We affirm the Board's findings if they are supported by substantial evidence, even if we might have made a different finding. *Central Transport, Inc. v. NLRB*, 997 F.2d 1180 (7th Cir.1993). As to credibility determinations when there are two conflicting versions of the same incident, the ALJ's credibility determinations are entitled to deference. We avoid redetermining credibility "on the basis of a cold record." *Carry Companies of Illinois, Inc. v. NLRB*, 30 F.3d 922, 928 (7th Cir.1994).

In fact, in this case, the principal attack the company makes on the decision of the NLRB relates to the credibility findings of the ALJ. The company contends that this particular ALJ is biased; that he always uses the same words in his decisions—the company calls it a "mantra"; and that he has never seen an unfair labor practice claim he did not like. A similar attack was made before the Board. Joy presented an analysis of how often the ALJ involved in this case credited General Counsel's witnesses rather than employer witnesses and contended that the ALJ was 4.6 times more likely to credit the former rather than employer witnesses. However, Joy is careful to make no representations regarding the reliability of the study except that its best efforts were used in compiling the information. That the study is clearly and admittedly unscientific undermines its usefulness. More importantly, as

the NLRB points out, Joy analyzed cases in which the respondent was a company but did not include any cases in which a union was the respondent. What may be true is that the ALJ may have in the past believed the NLRB's witnesses more often than a respondent's witnesses, whether that respondent was a company or a union. Given that we have no reason to believe that the NLRB brings cases without making its own determination as to whose story is credible, that result may not be much more surprising than that the conviction rate of U.S. Attorneys is vastly higher than the acquittal rate of defense attorneys, a comparison which, we believe, underlines the danger in our crediting statistical studies of credibility determinations.

■ The primary point here is, however, that generally decisions are most appropriately reviewed carefully and on their own merits. And that is what the Board did in this case. It looked at the record and concluded that the credibility findings were entitled to deference. We agree. It is not true, as Joy contends, that the ALJ simply made blanket statements regarding credibility. The ALJ in this case was confronted with two explanations of events, two versions of the story. In such a case a judge must decide which one is more credible. We think a statement such as the following to be a quite adequate explanation of his choice:

> And, I reject here as equally incredible the assertions by Matza, Young and Bowman that the Employer's sudden decision on August 11 to resort to total outsourcing or total subcontracting of its transportation services was not in response to or caused by the transportation department employees turning to the Union to represent them. The credible evidence of record, as discussed below, demonstrates that Respondent Employer had operated its transportation department at a financial loss for many months; had instituted comprehensive studies and actions then under way to improve its services in this department and had not taken any steps to totally outsource or totally subcontract its transportation services until the employees sought Union representation. I am persuaded on

this record that the Employer's sudden August 11 decision to totally outsource or totally subcontract this work was in response to this employee protected activity and would not have occurred had the employees not sought Union representation. The judge on the front line is in the best position to determine which of two stories told by competing witnesses should be credited.

■■■■ We will turn now to the merits. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of the right to organize. The test for determining whether a violation has occurred is whether an employer's actions had a reasonable tendency to interfere with or coerce employees, not whether the employer intended to interfere. *NLRB v. Q–1 Motor Express*, 25 F.3d 473 (7th Cir.1994), *cert. denied*, 513 U.S. 1080, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995). Whether an employer's questioning of an employee is coercive depends on the factual context in which the questioning occurs. *NLRB v. Shelby Mem'l Hosp. Ass'n*, 1 F.3d 550 (7th Cir.1993). The testimony of the employees, credited by the ALJ and the Board, is clearly sufficient to support a finding of coercion. The testimony shows a sense of company hostility toward the union, and certainly, for instance, asking an employee to secretly tape record union meetings is coercive. That the employees felt coerced is shown by the fact that they lied in response to questioning by company agents.

■■■■ However, the company contends that its questioning of Julia Chandler was not unlawful because she was a supervisor. We note at the outset that the burden of establishing supervisory status is on the one asserting it. *NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427 (9th Cir.1991). On this point, Chandler's credibility is much in dispute because her description of her authority is partial support for the claim that she was an eligible member of the bargaining unit. She says that she did not have the power to hire or fire. She acknowledged that she recommended that certain employees be disciplined but maintained that someone higher up the chain of command had to approve the action. The company contends that she had authority to approve overtime, days off, and cash advances of up to $300. Those powers, along with her authority to recommend discipline and discharge, gave her, the company says, authority similar to the dispatcher, who was found to be a supervisor, in *E & L Transport Co. v. NLRB*, 85 F.3d 1258 (7th Cir.1996).

■■■■ The Board's determination as to whether a particular position is supervisory within the Act is an application of law to fact, reviewed under the substantial evidence standard. *E & L*, 85 F.3d at 1269. The definition of supervisor is found in § 152(11):

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

In that section Congress sought to distinguish between "genuine management prerogatives" and employees—such as straw bosses and lead men—who enjoy the Act's protections even though they perform "minor supervisory duties." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 280–83, 94 S.Ct. 1757, 1765–66, 40 L.Ed.2d 134 (1974) (quoting S.Rep. No. 105, 80th Cong., 1st Sess. 4 (1947)).

It is not always an easy distinction to draw, and a position as a dispatcher is one which falls on the line. In *E & L* we found that a dispatcher who used the title supervisor, issued reprimands, identified with management, attended management meetings, and oversaw a work force of 69 employees was a supervisor. He was also a salaried employee. Chandler, on the other hand, clearly did not identify with management, but with the 8 or so employees she was the dispatcher for. She was not salaried, but rather was paid $9 per hour, less than the drivers she dispatched. The incidents in which employees were disciplined upon her

"recommendation" are not convincing evidence that she had supervisory status. After an incident of an employee throwing credit cards at her for the second time, Chandler went to plant manager Pawlenko to see whether there was any way to suspend the employee. Pawlenko told her to suspend the employee for three days. That is not compelling evidence that Chandler had authority to discipline the employee or even to effectively recommend discipline. Later Pawlenko apparently agreed to listen to the disciplined employee's side of the story. When, during the meeting of the two men, with Chandler present, the employee became abusive to Pawlenko, Pawlenko terminated him without ado. The other example put forward by the company to show Chandler's supervisory status involves an incident in which an employee feigned that he had been kidnaped and called Chandler, telling her that he was being held hostage. The incident frightened her, and she asked the plant manager to fire him. It would seem that any employee, including those unquestionably eligible for the bargaining unit, would have the right to request that a fellow employee be disciplined for either of these incidents. Had Chandler perceived herself as having, or had she been perceived by others as having, the authority to discipline or recommend discipline, one would expect her action in response to these events to be considerably more direct. There is substantial evidence in the record to support the Board's conclusion that Chandler was not a supervisor within the meaning of § 152(11).

Section 8(a)(3) prohibits discrimination against any employee in order to discourage membership in a union. An employer violates Section 8(a)(3) by retaliating against employees for engaging in union activities. In *NLRB v. Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083, 1980 WL 12312 (1980), the NLRB set out a framework for analyzing such claims. The *Wright Line* test requires General Counsel to prove that antiunion animus was a substantial or motivating factor in the employer's decision to make adverse employment decisions. The employer can then avoid a finding of an unfair labor practice if it can show that it would have taken the action

regardless; that is, for legitimate reasons. The test was approved by the Supreme Court in *NLRB v. Transportation Management*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). However, in *Director, Office of Workers' Compensation Programs, Department of Labor v. Greenwich Collieries*, 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), the Court rejected the interpretation of § 7(c) of the Administrative Procedure Act (5 U.S.C. § 556(d)) set out in *Transportation Management* but reaffirmed its holding. The Court stated:

> The NLRB's approach in *Transportation Management* is consistent with § 7(c) because the NLRB first required the employee to persuade it that antiunion sentiment contributed to the employer's decision. Only then did the NLRB place the burden of persuasion on the employer as to its affirmative defense.

*Greenwich Collieries* has been read, nevertheless, as a modest refinement or clarification of the *Wright Line* standard. It makes clear that the analysis does not simply require General Counsel to establish a prima facie case. General Counsel must establish that antiunion animus was a motivating factor in the decision. If General Counsel succeeds, the employer—to escape a finding of an unfair labor practice—must establish its affirmative defense—that it would have taken the action regardless for nondiscriminatory reasons. *See Schaeff Inc. v. NLRB*, 113 F.3d 264 n. 5 (D.C.Cir.1997).

In this case, timing is everything. The closing of the department comes on the heels of the union's organizational activity. But it also follows a troublesome time with the transportation department and, in fact, a study of the department. In a sense, timing supports both sides. We think, however, that on the record as a whole, there is substantial evidence to support the finding that the decision to close the department was a result of antiunion animus. The timing of the elimination of the department, coming as it did, right after the union sought recognition, the testimony that the Bowman study was initially commissioned to improve the department, the fact that Joy had seemed to

want to have a transportation department so that it would be harder for Ameritech to ship to other recyclers—or easier to ship to Joy, and the fact that the company maintained the department, unprofitably, for a significant period of time—all provide substantial evidence for the decision reached by the Board rather than for the opposite conclusion that the department was closed for legitimate business reasons.

█ Similarly, there is evidence to support the finding that the discipline of Kizior, who was correctly suspected of being behind the unionization effort, was unlawful. Again, the timing was suspicious. Also, the company explanation that Kizior was suspended for taking a truck without authorization is suspect. Chandler's records show that Pawlenko approved Kizior's taking the truck to take Lopez to his driver's test. That was all that Kizior did.

The next question involves whether the company had a duty to bargain about the closing of the department. Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to refuse to bargain with the representative of the employees over a mandatory subject of bargaining. The company says that it did not violate this section because it did not refuse to bargain, and in any event the union did not have majority status nor was the closing of the department a mandatory subject of bargaining.

█ Joy contends that majority status was not established because of supervisory participation in the unionization effort and furthermore that the union waived its right to bargain. Chandler is the alleged supervisor, so the claim as to supervisory participation in the unionization effort must fail for the reasons we have just noted. As to whether Joy was willing to bargain, Joy wrote a letter to the union on August 12 in which it said that if the union had majority status it would bargain over the effects of Joy's decision. The union did not respond to the August 12 letter in which this offer was made. The NLRB found that because the letter was merely an offer to bargain over a foregone conclusion, bargaining would be futile. There is substantial evidence to support this finding. A waiver of statutory bargain-

ing rights must be clear and unmistakable. *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983). Here, the union did not waive its right to bargain; had it bargained it would merely have been lending legitimacy to the decision which had already been made.

█ Next, we must consider whether the Board was right to conclude that Joy had a duty to bargain over the closing of the department and subcontracting the work. Under Section 8(a)(5) (29 U.S.C. § 158(a)(5)), it is an unfair labor practice for an employer to refuse to bargain with the representative of the employees. Under § 158(d) the employer and the employees' representative have a mutual obligation to confer with respect to wages, hours, and "other terms and conditions of employment." One question, then, is whether the closing of the department involves a term or condition of employment.

*Fibreboard Paper Products v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), says that a decision to subcontract work is a mandatory subject of bargaining. However, in a subsequent case the Court determined that an entrepreneurial decision to close down part of a business for purely economic reasons is not a mandatory subject of bargaining. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). The contrast is between a decision to substitute one set of employees for another and the decision to change the scope and direction of the business. However, in ruling for the employer in *First National Maintenance*, the Court emphasized that the motivation of the company was purely economic; there was no claim of antiunion animus. And the Court pointed out that under Section 8(a)(3) a union is protected against a partial closing of an operation which is motivated by hostility toward the union. Here, the Board specifically adopted the ALJ's determination that Joy violated Section 8(a)(5). What two members of the Board said was that "it is well established that an employer's subcontracting decision cannot be a legitimate entrepreneurial decision exempt from bargaining when, as here, antiunion considerations are at the heart of

the alleged fundamental change in the direction of the corporate enterprise." A third member would have found it unnecessary to decide whether Joy violated Section 8(a)(5) because the violation of Section 8(a)(3) is clear.

We find that there is substantial evidence to support the Board's decision. First, the decision to close the department was not made for purely economic reasons. And, secondly, we have found substantial evidence to support the Board's finding that hostility toward the union is the motivating force behind the decision. That finding prevents the application of *First National Maintenance* and also sustains a finding that the company violated Section 8(a)(3).

■■■ So we arrive at the issue as to whether the remedial order was an abuse of the Board's discretion. Joy contends that the part of the order requiring the restoration of the transportation department would be difficult and expensive. First, we note that the Board was within its authority to issue such as order unless the company demonstrates that a restoration order would be unduly burdensome. *Jays Foods, Inc. v. NLRB*, 573 F.2d 438 (7th Cir.1978). Here, as the Board noted, Joy continues to have an ongoing contractual relationship with Ameritech to provide trucking services and still owns all the equipment used to transport the scrap. Furthermore, two of its former employees work for one of the subcontractors.

■ Finally, we consider whether the bargaining order was appropriate. In *Gissel* the Court determined that the duty to bargain can arise without a Board election if majority status of the union can be established by union authorization cards and if the company engages in unfair labor practices which would undermine the ability to have a fair election. Furthermore, under *Gissel* the Board is granted significant discretion in the remedial orders it issues.

Here, there is clearly majority status. There are also unfair labor practices which would undermine the ability to hold a fair election. The unit is small; the employees have all lost their jobs; they were intimidated when questioned by high level managers even before the department was closed. There is a significant basis on which to issue a *Gissel* order to bargain. The order of the National Labor Relations Board is enforced in its entirety.