**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOUIS A. WEISS MEMORIAL HOSPITAL, Respondent.**

No. 98–1827.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 1998.

Decided March 24, 1999.

Rehearing Denied June 2, 1999.

Elizabeth Kinney, N.L.R.B., Region 13, Chicago, IL, John D. Burgoyne (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner.

Charles T. Whalen, Julie L. Trester, James N. Kosmond (argued), Querry & Harrow, Chicago, IL, for Respondent.

Before BAUER, FLAUM and MANION, Circuit Judges.

MANION, Circuit Judge.

The NLRB petitioned this court to enforce its order requiring that Louis A. Weiss Memorial Hospital ("Weiss" or "the Hospital") reinstate former employee Barbara Zimmerman because the Board, adopting the ALJ's opinion, found that the Hospital had committed an unfair labor practice by terminating Zimmerman for union activity. Because we conclude that substantial evidence does not support the ALJ's conclusion that General Counsel met its burden of proof to show that antiunion animus was a motivating factor in the Hospital's decision to terminate Zimmerman as part of an otherwise lawful reduction in force, we decline to enforce that part of the Board's order. We do enforce, however, the part of the order relating to the Hospital's limiting employees' rights to advocate on behalf of the union.

### Background

Weiss is a non-profit, 200–bed hospital serving Chicago's north side. It is affiliated with the University of Chicago Hospitals (UCH), which means that although Weiss is a separate corporate entity, it has arrangements in place with the UCH for such things as the transfer of patients requiring more care than Weiss can deliver. The charging party, Barbara Zimmerman, worked at the Hospital from July 1970 to September 1994, when she was terminated in a large-scale reduction in force that eliminated 20 percent of the Hospital's management and 13 percent of its employees. Zimmerman worked as a diet technician in the diet office, which was part of the Hospital's Food and Nutrition Services Department. The diet office also employed dieticians, who were required to have a college degree and be certified— two requirements that diet technicians like Zimmerman did not have. Carol Schwartz was the supervisor of the diet office and therefore was Zimmerman's direct supervisor. Schwartz reported to Jonathan Kirk, who was the operations manager over the entire Food and Nutrition Services Department. That Department also included the food service aides and the kitchen staff.

Over a period of several years, the Warehouse, Mail Order, Office Technical and Professional Employees Union, Local 743, International Brotherhood of Teamsters, AFL–CIO ("Local 743") attempted to organize various employees of the Hospital but with little success. In November 1991, Local 743 filed a petition with the Board's Regional Director seeking representation of a unit of about 175 of the Hospital's service and maintenance employees. In May 1992, the Regional Director ordered an election in a unit larger than requested, so Local 743 withdrew its petition and no election was held. Beginning in late 1991 or early 1992—the record is unclear on the date—Local 743 represented about 17 of the Hospital's plant operations and maintenance employees. After the Hospital and Local 743 could not reach agreement on a contract for these employees after 18 months of negotiating, Local 743 walked away.

In the fall of 1993, Zimmerman and some other employees decided they wanted another attempt at unionizing Weiss. Zimmerman telephoned Local 743 and spoke with a union representative. Zimmerman later met with the representative and got blank union authorization cards, which she distributed to employees. Zimmerman eventually got back about 60 signed cards and gave them to Local 743. Zimmerman testified that while she was distributing the cards, a supervisor of the food service aides, Fannie Smith, told her that she (Smith) had heard Zimmerman was distributing union cards and that she had better be careful.[1]

Some time in the spring of 1994—again the exact date is unclear from the record—Local 743 petitioned for an election in a unit of the Hospital's service, maintenance, and business office clerical employees, which unit had about 488 employees. The Hospital stipulated to an election in that unit, and the election was scheduled for May 12, 1994. In the months leading up to the election, Zimmerman actively campaigned for the union. She attended several meetings, passed out union stickers and buttons, and distributed a pro-union letter to her fellow employees, although the letter was anonymous.

There seems to have been considerable concern among some employees—including Zimmerman—regarding the relationship between Weiss and the UCH. Some employees were concerned that they were not receiving benefits equal to those at the UCH. On April 26, 1994, Dean Harrison, president of Weiss Hospital, sent a letter to all employees explaining the difference between the UCH and Weiss as well as the relationship between them.[2] The letter indicated that because the differences between the hospitals was so great, it was inappropriate to compare the benefits of employees at Weiss and those at the UCH. Harrison suggested that when the Hospital's employees' benefits were compared to those of employees of similarly situated hospitals—what he referred to as "our real competitors"—their benefits compared favorably.

Zimmerman testified that on about May 1, 1994, she telephoned an unspecified person at the UCH and inquired what relationship Weiss had to the UCH. She testified that this person informed her that Weiss was one of the University of Chicago Hospitals. She then asked this person who Dean Harrison at Weiss was, and was told Harrison was president of Weiss and that Ralph Muller "was president over all the hospitals."

On about May 7, 1994, Zimmerman and about 15 other Food and Nutrition Services employees attended a meeting conducted by Robert True, who was the Director of Support Services, which included the Food and Nutrition Services Department. True was thus Kirk's direct supervisor. At this meeting, True used props to convey the message that a union was not in the employees' economic interest. He had a "treasure chest" with phony money and told the employees that they held the key to the treasure chest, and that the union only wanted to take the employees' money. True also used "trick matches" to burn up the money, indicating that the union would make the employees' money go up in smoke. The ALJ summarized Zimmerman's testimony regarding her participation in the meeting:

> True said that the Union wanted a lot of money. Zimmerman asked what was a

---

1. Smith testified that she told Zimmerman not to distribute the cards to the food service aides when they were working but to wait until their break time and that after this request Zimmerman refrained from passing out cards to employees while they were working. The ALJ credited Zimmerman's testimony over that of Smith.

2. Weiss and the UCH were legally separate corporations with different boards and by-laws; they are located in different parts of the city; they offer significantly different services (the UCH being a teaching hospital treating difficult and complex cases); because of the differences the charge and expense structures are significantly different.

lot of money. He said $12 a month. Zimmerman then asked how many employees in the room blew that amount of money a week or a month on lottery tickets "or whatever and we don't know what we have done with our money." Zimmerman asked what [Weiss]'s connection was with the UCH. True said that both institutions were hospitals, but there was really no connection. Zimmerman asked whether there had been any unions at the UCH, and explained that she had heard there had been unions there for many years, the employees had not gone on strike or had any problems, and they had many benefits. She said that the employees of [Weiss] merely wanted the same benefits and treatment that the employees had at the UCH. She asked, "who Dean Harrison was to the University of Chicago Hospital." True said that Dean Harrison was in charge at [Weiss]'s hospital and there was no relationship to the UCH. Zimmerman said she had been told that Harrison was president at [Weiss]'s hospital, but that Ralph Muller was in charge of the University of Chicago Hospitals, and that [Weiss]'s hospital did indeed belong to the UCH. True said that McDonald's on Foster was different from McDonald's on Lawrence. Zimmerman said that problems with McDonald's could be corrected by going to the corporate office and getting them corrected, and asked whether [Weiss]'s employees were supposed to go to the UCH for correction. True reddened, and turn his back to Zimmerman.

ALJ Op. pp. 3–4.

Curiously, the ALJ's opinion notes that Harrison's April 26 letter was "inferentially, after the [May 7] meeting." The ALJ makes no explanation what inference leads to the conclusion that the April 26 letter came after the May 7 meeting, and in fact the only evidence in the record contradicts this conclusion. When counsel for the General Counsel introduced this letter, she asked Zimmerman, "Did you receive it on or about the date in the left-hand corner [April 26, 1994]?" Zimmerman responded, "I believe so." And Zimmerman had previously indicated that the meeting with True took place "[a]bout a week before the [May 12] election." Moreover, Zimmerman's chronology makes more sense. The letter from Harrison discussing the relationship with the UCH apparently prompted Zimmerman to investigate who Harrison was and to verify or refute his assertions. And armed with what she thought she had learned from her May 1 phone call to the UCH, she challenged True at the May 7 meeting.

Also on about May 7, Zimmerman had a confrontation with Jim Mitchell, the Hospital's executive chef. Mitchell supervised the cooks in the Hospital's kitchen. The testimony in the record regarding this confrontation is in considerable conflict; the ALJ's findings are based on Zimmerman's version of events. Outside Mitchell's office in the kitchen was a bulletin board for the posting of weekly menus—for the cooks' convenience—and the hospital newsletter. About five minutes prior to seeing Zimmerman in the kitchen by the bulletin board, Mitchell testified that he saw the bulletin board and there was no union flier on it. Immediately after seeing Zimmerman, he saw a union flier on the board. So he took the flier down and told Zimmerman not to post anything on his bulletin board. He apparently also told Carol Schwartz, Zimmerman's supervisor, about the incident and asked Schwartz to counsel Zimmerman about not putting "union" stuff on his bulletin board, which she did. Although the testimony is conflicting, apparently Zimmerman and Mitchell had a subsequent confrontation about the incident, and Mitchell told Zimmerman not to discuss union matters with the cooks.

On May 12, the day of the election, Zimmerman worked as an observer monitoring the polls. Early that morning, the Hospital distributed to numerous employees—the record is unclear how many—a letter addressed to the employee from

Harrison, urging the employee not to vote for the union. Zimmerman testified that she did not get such a letter, but that many other employees showed her theirs that day. Zimmerman apparently asked Smith, one of the food aide supervisors, where her (Zimmerman's) letter was. Smith replied that "we know where you stand with the Union, so what does it matter?" Smith denied making this statement. Kirk testified that he believed that letters were handed out to employees and if an employee was not found, the letter was returned to the human resources department; he believed that is what happened to Zimmerman's letter. The ALJ specifically credited Zimmerman's version of events over Smith's, but she did not make any finding about Kirk's version, which is significant because it is not necessarily in conflict with Zimmerman's, and Kirk's motivation and feelings are much more important than Smith's because Kirk had a hand in terminating Zimmerman, while Smith did not.

The union lost the election by a wide margin (256 to 151 with 17 nondeterminative challenges). The next day, the union filed unfair labor charges against the Hospital regarding the election, and Zimmerman made a statement to the Board's Regional Office. The record does not indicate how many other employees offered information regarding this charge. A month later, on June 13, 1994, the Regional Office dismissed the charge due to "insufficient evidence." Local 743 never appealed the dismissal.

In addition to making a statement to the Regional Director, Zimmerman sent a two-page typed letter to Ralph Muller, president of the University of Chicago Hospitals, on about May 13 (the day after the election). This letter is somewhat difficult to follow, but essentially Zimmerman complained to Muller about various acts that could be considered unfair labor practices. For example, she asserted that a supervisor was present at the table when employees came in to vote. She also complained about various statements made by Harrison and others regarding the relationship between Weiss and the UCH. Zimmerman also complained that someone distributed an article showing union representatives wearing Rolex watches. Near the end of the letter, Zimmerman stated, "I need to know from you who you are and what you are to me and Weiss. Are you ashamed of us or should we be ashamed of you and the U of C?" Muller apparently forwarded this letter to Harrison, who forwarded it to Carol House, a vice president in charge of human resources. Harrison asked House to reply to Zimmerman's letter, and House did so in a letter dated June 3. House indicated that Weiss had not sent any materials to the employees' homes and that the article regarding the Rolex watches had been distributed by "concerned employees." House closed the letter by stating, "If I can be of further assistance, don't hesitate to contact me directly."

In late May, Zimmerman and Mitchell had another confrontation. Again, there is considerable difference in the testimony between the various persons involved. Zimmerman, whom the ALJ found credible on this point, testified that Mitchell told Zimmerman that he was tired of his supervisors complaining to him about Zimmerman and the union. Zimmerman asked who Mitchell's supervisors were, and he stated Smith and Ceile Davis, who are both supervisors of the food service aides, that is, both supervisors like Mitchell under Kirk. Neither of them reported to Mitchell nor did Mitchell report to them. Zimmerman wanted to talk to Kirk to "get the matter straightened out[ ] because she had no idea what anybody was talking about." Because Kirk, Smith, and Davis all had the day off—it was a Wednesday— Zimmerman left a note on Smith's and Davis's time cards, indicating that she needed to talk to them. When Zimmerman talked with Smith and Davis on the following Saturday, each stated that they had not discussed Zimmerman and the union with Mitchell. That day, Zimmer-

man and Kirk had a phone conversation regarding the matter. The ALJ summarized the testimony she found credible from both witnesses regarding this conversation as follows:

> ... Kirk telephoned Zimmerman, told her that he had received a telephone call from Davis or Smith about the situation with Mitchell, and asked Zimmerman to explain what happened. Zimmerman said that Mitchell was "demanding" that she exit the diet office [to have a conversation with him], and that Mitchell had told her that he was tired of his supervisors' complaining to him about her and the Union. She asked Kirk whom Mitchell supervised. Kirk said that Mitchell was only over the cooks. Zimmerman said that she was afraid of Mitchell and did not want to deal with him, and asked Kirk to come to the hospital and handle the situation; Kirk said that because of a family emergency, he could not go to the hospital. Zimmerman requested that any dealings between her and Mitchell go through either Kirk or Schwartz. Kirk agreed that this arrangement would be followed. Kirk told her that if she felt scared or threatened, she should not hesitate to call "security." She asked him to take care of the situation on the following Monday; he said that he would. Zimmerman never again discussed the matter with Kirk, or complained to him about Mitchell.

ALJ Op. p. 7 (footnote omitted).

In June 1994, Weiss found itself in serious financial difficulty. From 1989 to 1993, its operating costs had increased 41 percent while its revenues had declined. Costs were expected to increase another 12 percent the following year. That month, the Hospital hired Arthur Andersen & Company, a national consulting firm, to make recommendations regarding what the Hospital could do to make a turnaround. At the beginning of July, Arthur Andersen rendered its recommendations, which included cutting staff from the then-current 974 "full-time-equivalents" (FTEs) to 815. (An FTE is either one full-time employee or a combination of part-time employees equaling a full-time employee.) On July 15, the Hospital distributed a memo to all employees from Harrison. We quote it in its entirety:

> As you know, the experts from Arthur Andersen & Company have been retained to help accelerate our efforts to increase operating efficiency at Weiss. They have completed an initial analysis and have identified where opportunities exist to streamline work and use staff more efficiently.

> Over the next two weeks, Arthur Andersen will be meeting with Corporate Staff, together with managers, on a department-by-department basis. Your input will be solicited on how to achieve operational efficiencies in your department and throughout the organization as a whole. Nearly every aspect of operations will be considered, including labor and non-labor expenses.

> As part of this process, we have offered an early retirement incentive program to Weiss employees who have at least five years vested service with the Hospital and are 55 years of age or older. The eligible employees received their benefit packages today and will have 45 days to consider the offer. Should you have any questions regarding early retirement, please feel free to contact Human Resources at extension 1300.

> As I have mentioned before, if we can manage to work smarter and adjust appropriately to the trends, we will be successful. I anticipate this process will ensure the future success of Weiss Hospital and I hope every employee will engage as we re-engineer.

Resp. Exh. 10. The forty-five days allowed to those eligible for early retirement meant that they had to make a decision by August 29. About 116 employees were eligible for early retirement, but only 32 accepted. Significantly neither Zimmerman nor either of the

other two diet technicians was eligible for early retirement.

On August 9, 1994, House distributed a package to "Corporate Staff," who were seven corporate officers above the managers and directors such as Kirk and True. The package contained the materials needed for the managers' participation in the "Rightsizing Process," the term Weiss used to describe the reduction in force the Hospital believed was necessary to survive. The package contained forms for the managers to rate and rank each of the employees in his or her department. The materials explained the process in detail, setting out the deadlines for each step in the process. The package also contained a flow-chart and time-line setting out graphically the steps and date by which they were to be completed.

The managers were to rate and rank the employees by August 11. Kirk was the manager tasked with rating and ranking Zimmerman as well as the other employees in the Food and Nutrition Services Department. By August 15, these initial ratings and rankings were to be reviewed and approved by the managers' superiors, which process was called a "second tier review." For the Food and Nutrition Services Department, this second tier review was conducted by True. By that date, the second tier review would produce a "preliminary layoff list," which would identify employees to be laid off in the Rightsizing Process. House's memorandum to the directors indicated that the preliminary layoff lists were to be their "creation" and that they "should prepare a separate 'Layoff List' for each department or job title." The human resources department was then to conduct a review of the results of the preliminary layoff lists on August 15 and 16 and after approving the lists, would forward them to the "Corporate Staff" for final approval. The time-line also indicates that on August 29 the list of employees taking early retirement would be final and so on August 30 the final layoff list would be revised if necessary. Since none

of the three diet technicians was eligible for early retirement the decision was not contingent on a possible change in status on August 30. Based on the testimony before the ALJ, the Rightsizing Process proceeded essentially in accord with the time-line established in the package House distributed.

Kirk, using the materials provided to him, rated and ranked each of the three diet technicians: Zimmerman, Corazon Sueno, and Carolyn Hargrove. The rating forms for each employee required the managers to rate the employees in six categories: Quality of Work, Quantity of Work, Guest Relations, Job Skills, Attendance, and Job-Related Experience/Education. The manager was to rate each employee in each category from 1 to 5, with 5 being the highest, but the first five categories were weighted double so that the final score in those categories would be between 2 and 10. Adding up the employee's scores in the six categories thus yielded a total between 11 and 55.

For Quality of Work, Kirk rated Zimmerman a '4' and Hargrove and Sueno both '3.' For Quantity of Work, Kirk rated all three a '4.' This assessment of the diet technicians' work corresponds roughly with their previous "Performance Planning and Appraisal" (PPA) ratings. A PPA was prepared annually for each employee on the employee's anniversary date. The PPA rating was not expected to mirror exactly the ratings in the Rightsizing Process, however, because the PPA ratings were concerned primarily with where the employee was and what development was needed, whereas the Rightsizing Process was intended to identify the best employees to have at the Hospital after a significant reduction in staff. But the PPAs were certainly a measure that corresponded to some extent with the quality and quantity of the employee's work, and so the Rightsizing package for the managers included for reference some prior PPA scores for each employee. Hargrove did not have a PPA rating for 1991 because

she was apparently hired that year. The 1991 PPA ratings for Sueno and Zimmerman, which were prepared by Schwartz's predecessor, were 85.0 and 98.75, respectively. For 1992, the first year the PPAs were done by Schwartz, the scores were Hargrove 60, Sueno 66.25, and Zimmerman 60. For 1993 they were Hargrove 58.75, Sueno 71.25, and Zimmerman 73.75. For 1994, only Hargrove and Sueno had PPAs by the time of the Rightsizing because Zimmerman's anniversary—and thus the time for her PPA—was in September. (For that year, Hargrove's score was 72.5 and Sueno's was 86.25.) As we said, these prior PPA scores are roughly consistent with Kirk's rating Zimmerman one point higher than Sueno and Hargrove for Quality of Work and the same for Quantity of Work.

For the Guest Relations category, Kirk testified that he rated an employee a '2' if there had been guest—that is, patient—complaints about the employee, a '3' if there had been neither complaints nor compliments, and a '4' if there had been compliments. There had been a guest complaint regarding Zimmerman in March 1994. A patient had complained that Zimmerman was rude to her, specifically that she walked away from the patient while she was speaking to Zimmerman. Schwartz verbally counseled Zimmerman regarding this complaint, and placed a written record of the incident in Zimmerman's personnel file at Kirk's direction. Because of this complaint, Kirk rated Zimmerman a '2' but rated Sueno and Hargrove each a '4' because he knew of compliments that they had received.

For Job Skills, Kirk rated Zimmerman and Hargrove a '4' and Sueno a '3.' On both Zimmerman's and Hargrove's forms, Kirk noted "Picks up new skills & instructions easily" and for Sueno noted "Good ability to learn new skills, positive to change."

The instructions for the rating forms indicated that the employees' Attendance score would be purely objective: "When rating attendance the actual number of occurrences with twelve (12) months should be measured." The number of occurrences corresponded as follows: a score of 5 equaled 0 times; 4 equaled 1 time; 3 equaled 2 times; 2 equaled 3 to 4 times; and 1 equaled 5 or more times. Based on this objective scoring, Zimmerman was rated '2,' Hargrove '1,' and Sueno '5.' There is no evidence in the record that these scores are incorrect based on the diet technicians' attendance over the previous year.

For Job–Related Experience/Education, Kirk rated Zimmerman and Hargrove '2' and Sueno '3.' He testified that he did this because neither Zimmerman nor Hargrove had a college degree, but Sueno did.

The ratings of the three diet technicians can thus be set out as follows. (Remember that the scores for the first five categories are weighted double.)

| | Zimmerman | Hargrove | Sueno |
|---|---|---|---|
| Quality of Work | 8 | 6 | 6 |
| Quantity of Work | 8 | 8 | 8 |
| Guest Relations | 4 | 8 | 8 |
| Job Skills | 8 | 8 | 6 |
| Attendance | 4 | 2 | 10 |
| Job–Related Experience/Education | 2 | 2 | 3 |
| TOTAL | 34 | 34 | 41 |

Seniority at the Hospital was not separately rated, but was a tie-breaker. Thus, Zimmerman, who had the greatest seniority of the diet technicians, would have been ranked above Hargrove. If only one diet technician were to be laid off, it would be Hargrove; if two were to be laid off, Zimmerman would go as well.

During the Rightsizing Process, it was in fact determined that two of the three diet technician positions would be eliminated. The ALJ considered the details of the decision to eliminate two diet technicians rather than one or none to be of considerable importance. House testified that she did not know for certain who made the decision to eliminate two diet technicians. When asked by counsel for the General Counsel how the decisions regarding which positions to eliminate were made, House testified:

First of all, we had guidelines from Arthur Andersen who looked at the different departments and areas and made recommendations. The senior executive over each area met with their directors and managers, told them what we were doing, and they said look at your staff, look at your departments and make some recommendations how you would do this.

Trans. 407. True and Kirk were the director and manager respectively over the Food and Nutrition Services employees, including the diet technicians. So House assumed that True and Kirk made the decision to eliminate two diet technicians, along with Beverly Tuck, who was the senior executive over True and Kirk. House assumed that Kirk made initial recommendations, which were reviewed by True, then reviewed by Tuck, and ultimately approved by House and human resources.

Whatever the exact timing of the decision to eliminate two diet technicians and whoever ultimately made it, a decision to eliminate two had been made by August 23. On a weekday between August 17 (a Wednesday) and August 23 (a Tuesday), Kirk and True met with Schwartz. They told her for the first time that two diet technicians would be laid off and showed her the ratings we have discussed above. Schwartz agreed with the ratings, and Kirk testified that after this meeting the materials were forwarded to human resources. If in fact the ratings were not sent to the human resources department until after this meeting, the timing described by this testimony is a little behind what was required under the package distributed to the directors and managers. The materials including a preliminary layoff list were to be submitted by August 15, reviewed by human resources by August 16, and the Corporate Staff were to have made their final approval by August 17. (This final layoff list, of course, was subject to revision after the number of people taking early retirement was known.)

As part of the Rightsizing Process, the Hospital eliminated 20 percent of its management and about 13 percent of its employees (129 FTEs out of 974). Within the Food and Nutrition Services Department, eight full-time employees were eliminated as well as four or five part-time employees. The layoffs were to take place on August 31, 1994—the date established by the Rightsizing time-line in the package House had distributed—and Zimmerman's termination letter is dated that day. But she was on vacation at that time, and Kirk decided not to tell her until she returned on September 12. The next day, Zimmerman filed a charge with the Board's Regional Director, asserting that she had been terminated for union activity.

On November 15, 1994, the Regional Director issued a complaint against Weiss. The case was heard before the ALJ from June 12 to 14, 1995. For reasons that do not appear in the record, the ALJ did not issue her decision for eighteen months, doing so on January 16, 1997. She found that Weiss had committed an unfair labor practice by terminating Zimmerman and ordered her reinstated with back-pay and with interest. The ALJ also found Weiss had committed an unfair labor practice when Mitchell told Zimmerman not to talk to the cooks about union matters. The Hospital appealed this decision to the Board, which adopted the ALJ's decision and order on October 31, 1997. On April 3, 1998, the Board petitioned this court for enforcement of its order.

## Analysis

■ Relevant to this case, section 8(a) of the Labor Management Relations Act (29 U.S.C. § 158(a)) provides that "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in [29 U.S.C. § 157]; ... [or] (3) by the discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any

labor organization." In this case, the ALJ concluded that the Hospital had violated section 8(a)(1) when Mitchell told Zimmerman not to talk to his cooks about union "stuff" and violated section 8(a)(3) and (a)(1) when it terminated Zimmerman. Our jurisdiction to enforce the NLRB's order is derived from 29 U.S.C. § 160(e), which provides that the Board's factual findings shall be conclusive "if supported by substantial evidence on the record considered as a whole." In this context, "substantial evidence" "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *see also NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1471 (7th Cir.1992) (same). "[W]e uphold the [Board's] legal conclusions if they have a reasonable basis in the law." *NLRB v. Joy Recovery Technology Corp.*, 134 F.3d 1307, 1312 (7th Cir.1998).

■■■ We will first analyze the finding relating to Zimmerman's termination, which was the principal issue dealt with by the ALJ and the parties before this court. "An employer violates Section 8(a)(3) by retaliating against employees for engaging in union activities." *Joy Recovery*, 134 F.3d at 1314. The appropriate analysis in such a case was set out by the Board in *NLRB v. Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980). Under this analysis, "General Counsel [must] prove that antiunion animus was a substantial or motivating factor in the employer's decision to make adverse employment decisions." *Joy Recovery*, 134 F.3d at 1314. If General Counsel succeeds in proving its case, "[t]he employer can then avoid a finding of unfair labor practice if it can show that it would have taken the action regardless; that is, for legitimate reasons." *Id.*

■■■ The Supreme Court approved the *Wright Line* analysis in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). But in *Director, Office of Workers' Compensation Programs, Dept. of Labor v. Greenwich Collieries*, 512 U.S. 267, 277–78, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), the Court disavowed a prior comment in a footnote in *Transportation Management* regarding the proper interpretation of § 7(c) of the Administrative Procedures Act (5 U.S.C. § 556(c)), which concerns where the burden of proof lies. We have concluded that *Greenwich Collieries* thus made clear that the *Wright Line* "analysis does not simply require General Counsel to establish a prima facie case. General Counsel must establish that antiunion animus was a motivating factor in the decision." *Joy Recovery*, 134 F.3d at 1314. General Counsel's burden under *Wright Line* is to prove its case by a preponderance of the evidence. Once General Counsel has met its burden of persuasion, the employer can avoid liability by proving its affirmative defense. This is in contrast to the shifting of burdens of production under the ubiquitous *McDonnell Douglas* analysis, which is merely a method for ordering the proof. *See NLRB v. GATX Logistics, Inc.*, 160 F.3d 353, 356 & n. 1 (7th Cir. 1998) (*McDonnell Douglas* analogy does not apply; General Counsel's initial burden is to establish an unfair labor practice by preponderance of evidence). General Counsel's burden has two components, which are interconnected and might be shown by overlapping evidence: (1) that the employer had antiunion animus, that is, was motivated to discriminate against employees engaged in union activities; and (2) that this animus was in fact a substantial or motivating factor in the decision to terminate the employee. In cases involving employers that are corporations such as the Hospital, one must look to the employer's agents (the managers and supervisors)—whose actions can be imputed to the employer—to find the motivations for their actions.

The ALJ concluded that "the record shows that [Weiss] strongly opposed the Union, and that [Weiss] knew about and

resented Zimmerman's union and perceived union activity." For supporting evidence, the ALJ cited: (1) Smith's comment to Zimmerman regarding the union cards; (2) Zimmerman's having kept a union mug and sticker on her desk throughout the election; (3) Zimmerman's disputing the truth of True's statements at the May 7 meeting; (4) Mitchell's various antiunion comments; (5) Smith's comment to Zimmerman that it did not matter whether she received the letter recommending not voting for the union because everyone knew where she stood on the issue; and (6) House's June 3 letter denying some of the allegations of an antiunion campaign contained in Zimmerman's May 13 letter. .

The record certainly establishes that Weiss's management opposed the union in the election and encouraged the employees to vote against it—as was their right. 29 U.S.C. § 158(c) (protecting the "expressing of any views, arguments, or opinion, or the disseminating thereof . . . if such expression contains no threat of reprisal or force or promise of benefit"); *NLRB v. Almet, Inc.*, 987 F.2d 445, 452 (7th Cir. 1993). It is much less certain that the record supports the characterization of "strongly opposed" but that detail is not particularly relevant. It is worth noting that Zimmerman's coworkers also opposed the union, by almost a two-to-one margin.

 Whether Smith and Mitchell made the antiunion statements that Zimmerman claimed they did, and which they denied, turns on issues of credibility, which is particularly within the ability of the ALJ to determine. *NLRB v. Gerig's Dump Trucking, Inc.*, 137 F.3d 936, 941 (7th Cir. 1998). We have no occasion to disregard those findings here.[3] But it is important to note that neither Mitchell nor Smith had a hand in the decision to terminate Zimmerman as part of the Rightsizing; that decision was primarily the result of

Kirk's ratings with the input and approval of True and, ultimately, Tuck, House, and the other Corporate Staff. (The ALJ made no mention of any demonstrated antiunion animus by Kirk.)

The finding of antiunion animus regarding True is the most important because, as counsel for the Board conceded at oral argument, of True, Mitchell, and Smith, True was the only one who had a direct role in the decision to terminate Zimmerman. The ALJ's conclusions on this matter were:

> [D]uring director of support service True's May 7 speech to a number of employees in the presence of food and nutrition operations manager Kirk, in an effort to induce employees to vote against the Union, Zimmerman openly disputed True's assertion that the Union wanted a lot of money, openly expressed the opinion that a union at UCH had improved employees' working conditions, and openly disputed True's assertion that [Weiss] and UCH were not connected in any significant respect. These publicly expressed views by Zimmerman not only caused True to redden and turn his back to her, but may have led to a letter to the employees from [Weiss]'s chief executive officer asserting that UCH and [Weiss] were significantly different.

ALJ Op. p. 21. As we have already pointed out, the ALJ's attempt to make the April 26 letter from Harrison as a follow-up to Zimmerman's May 7 confrontation with True is contradicted by the only evidence in the record. Aside from the obvious, that the "confrontation" occurred ten days after the date on the letter, Zimmerman testified she thought she received the letter on or about the April 26 date indicated. Moreover, we find it significant that General Counsel was unable to offer any evidence that Zimmerman rather than

---

3. The Hospital has not argued that we should disregard these credibility findings. We will do so in extraordinary cases where there is "a clear showing of bias by the ALJ, utter disregard for uncontroverted sworn testimony, or acceptance of testimony which on its face is incredible." *Central Transport, Inc. v. NLRB*, 997 F.2d 1180, 1190 (7th Cir.1993).

True was correct about the relationship between the UCH and Weiss. The only testimony on the relationship between the two was from House, and the ALJ specifically found her testimony credible on this point. House testified that the two were separate corporations. When asked to explain the connection between the two, she testified as follows:

> The University of Chicago Hospitals is an alliance and we are a part of that alliance. We are located on the north side. Many hospitals are affiliated in this day and age to survive. We were very fortunate at Weiss in being able to [sic] affiliated with the University of Chicago. What they are looking for, the reason they would affiliate with a small hospital like Weiss is to have an access point on the north side of Chicago, a way of bringing patients into the system. So it is good for them to affiliate with hospitals all over the Chicago area, including the suburbs, and other hospitals are doing the same thing like EHS and Advocate who has got tons of hospitals now.

> But the point is we are a separate independent corporation and we have to pay our salaries, we have to pay our expenses, and we are in terms of surviving, we need to prove that we are worthy of that affiliation in the sense that we have to be able to sustain our sales and our own existence.

Tr. 373. The April 26 letter from Harrison discussing the relationship between Weiss and the UCH also comports with House's testimony. The record also shows that Zimmerman was mistaken in her understanding of the relationship between the two. She apparently believed that Weiss was a subordinate corporation to the UCH. She demonstrated this mistaken belief quite clearly by addressing her May 13 letter to Muller, the president of the UCH, complaining about events at Weiss. And she also made clear in that letter that she did not believe what she had been told by the management at Weiss about the relationship between it and the UCH. General Counsel presented no evidence to contradict this clear indication that Zimmerman was mistaken in her beliefs. This is significant because it casts her disputing True's statements about the UCH in a much different light than the ALJ or the Board would have them. At oral argument, counsel for the Board emphasized that animus could be shown because Zimmerman publicly accused True of lying about the UCH. And that is a good characterization of the record. But nothing indicates that in fact True was lying rather than, as the record shows, Zimmerman was mistaken in her beliefs and for whatever reason refused to believe what she had been told, which was in fact truthful.

Similarly, General Counsel presented no evidence that House was lying when in the June 3 letter she denied that Weiss had sent any letters to employees' homes or had anything to do with the Rolex watch article. Thus, we do not see how her denials—which on this record we assume are truthful—are evidence that she or anyone else harbored antiunion animus.

We are thus left with the conclusion that General Counsel presented some evidence supporting a claim of antiunion animus, but it was not particularly strong, principally because the evidence is weak concerning the principal decision-maker, Kirk. But whatever the quantum of evidence that there was some antiunion animus among the Hospital's agents, the key issue in this case is whether General Counsel met its burden of proof to show that that animus manifested itself as an intent to discriminate against Zimmerman for her union activity during the reduction in force. In other words, the discriminatory intent had to be a motivation for or substantial part of the Hospital's decision to terminate her. The ALJ concluded that the evidence demonstrated that "Zimmerman's termination was not a mere incident to the August–September 1994 layoffs directed toward a relatively permanent reduction in the size of [Weiss]'s entire work

force; rather, such evidence shows that the lawfully motivated mass layoff was used by [Weiss] to conceal its reasons for terminating Zimmerman." The evidence relied upon by the ALJ was that House testified that until the results of the early retirement offers came back—August 29—the Hospital could not know exactly who would be laid off, and Schwartz testified that by no later than August 23, she met with Kirk and True, who told her that two diet technicians would be laid off and, based on the ratings they showed her, those two would be Hargrove and Zimmerman. The ALJ apparently concluded that this evidence alone indicated that the Hospital's explanation of the process leading to Zimmerman's termination was a lie. She stated " 'False defenses become a two-edged sword in that they may serve to support an ultimate inference of unlawful motive.' " ALJ Op. p. 22 (quoting *Western Plant Servs.*, 322 NLRB No. 25, slip op. at 12 (Sept. 6, 1996)). But because the August 29 deadline did not apply to the three diet technicians, this defense had only one "edge."

The failure of the ALJ's reasoning is simply that nothing in what Kirk and True told Schwartz indicates that they had deviated from the Rightsizing Process as outlined by House in her August 9 directions. As discussed above, under the time-line set out in that package, True was to have prepared a preliminary layoff list by no later than August 12. Thus, that list, which would have indicated which of the diet technicians were to be laid off, should have been done as much as a week-and-a-half before Schwartz's meeting with Kirk and True. And by August 17, again as much as a week before the meeting with Schwartz, the senior staff were to have made final approval of the preliminary layoff lists. The results of the early retirement program as of August 29 would only cause a revision of the final list approved as of the 17th. And one must recall that *none of the diet technicians was eligible to take early retirement.* So a layoff decision before August 29 was entirely appropriate.

General Counsel, who bore the burden of proof at this stage, failed to elicit any testimony from Kirk or True, who was not even called as a witness although he was the person who actually prepared the preliminary layoff list, regarding how the decision process played out among the Food and Nutrition Services Department employees. The leap from Schwartz's testimony regarding what she was told in the meeting with True and Kirk to the conclusion that those two somehow circumvented the Rightsizing Process is pure speculation. Nothing Schwartz stated was contradictory to the testimony of House or the time-line set out in the Rightsizing Package. If counsel for the General Counsel wanted to create a record from which this inference could be drawn, she needed to elicit some testimony on the matter.

Although the ALJ concluded that this evidence alone was sufficient to support her conclusion that the General Counsel had met its burden of proof, the ALJ listed other evidence that she believed supported the conclusion that the Hospital was dishonest in its reasons for terminating Zimmerman. She cited: (1) the Hospital's failure to call any witnesses who could explain how the decision to eliminate two diet technicians had been reached; (2) the absence of any evidence why as part of the Rightsizing Process the diet technicians were ranked as a separate job category rather than as part of a larger group of job categories; (3) "peculiarities" in the handling of a guest complaint against Zimmerman, which negatively affected her rating; (4) an absence of evidence that Zimmerman was offered the opportunity to take part-time employment, as some other employees were; (5) peculiarities in the way Kirk interpreted the "guest relations" and "education/experience" categories on the rating forms; and (6) the silence in the record as to why Human Resources had indicated its approval of Zimmerman's rating but not Sueno's or Hargrove's.

Several of these additional pieces of evidence that the ALJ considered to support her conclusion are really absences of proof or "silence" in the record, to use the ALJ's term. At oral argument, counsel for the Board emphasized these gaps in the record and argued that the ALJ properly invoked the "adverse inference" rule against the Hospital for failing to put on evidence to support its affirmative defense. But it is perfectly clear from the ALJ's opinion that she considered the gaps in the record to support General Counsel's burden of proof. That can't be. An absence of evidence does not cut in favor of the one who bears the burden of proof on an issue. *See Howard v. Wal–Mart Stores, Inc.*, 160 F.3d 358, 360 (7th Cir.1998). So while counsel for the Board is not wrong in his argument that the absence could hurt the Hospital in its affirmative defense, until General Counsel makes out its case, the Hospital need not prove its affirmative defense. In effect the ALJ and then the Board attempted to shift the burden of proof to the Hospital to disprove General Counsel's claims, which is not what the *Wright Line* analysis requires. The failure of General Counsel to create a factual record in no way supports a finding that General Counsel met its burden of proof.

The additional pieces of supporting evidence cited by the ALJ that do not rely on an absence in the record relate to perceived irregularities in the way Kirk rated Zimmerman in two of the six categories on the rightsizing forms: the "guest relations" category and the "education/experience" category. As noted above, in the "guest relations" category, Kirk testified that he used an objective system based on whether there had been complaints or compliments regarding an employee. General Counsel presented no evidence that Kirk was lying about his objective standard. Counsel put on no evidence that any of the other numerous Food and Nutrition Services employees—there were 45 such employees after the reduction in force—were not also rated by Kirk using this objective system. And the most fundamental flaw in the ALJ's reasoning was that the only evidence in the record supported the conclusion that Kirk properly applied this objective standard to the three diet technicians. The record shows that a patient had complained about Zimmerman's conduct—she herself admitted it—so she should have been rated a '2,' which she was, and there had been compliments about both Sueno and Hargrove so they both should have been rated a '4,' which they were. The ALJ's flyspecking of the written form that was placed in Zimmerman's personnel file over the incident is of no moment because she was not rated a '2' because the form was in her file; she was rated a '2' because there had been a complaint. The same is true of the ALJ's conclusion that it was peculiar for Kirk to believe that relations with other workers would be reflected in the "guest relations" category. Whether the ALJ, the Board, or this court thinks Kirk's rating system was unfair, unwise, or falls short of perfection is irrelevant. *See Atlas Metal Parts Co. v. NLRB*, 660 F.2d 304, 310 (7th Cir. 1981) ("An employer not motivated by anti-union animus may freely exercise its business judgment in hiring decisions, and the board should not substitute its judgment for the employer's."). General Counsel's burden was to show that an intent to discriminate against Zimmerman because of her union activity motivated Kirk to rate her a '2' in this category. And nothing in the record supports that conclusion; rather, the only evidence in the record supports the conclusion that she was rated a '2' in this category solely because of the admitted complaint. It was General Counsel's burden to create a record supporting the opposite conclusion and Counsel failed to do so.

As to the "education/experience" category, the ALJ reasoned:

Kirk testified . . . Sueno received a higher rating than Hargrove or Zimmerman because, although Hargrove and Zimmerman exceeded her as to job skills and as to the ability to pick up new skills

and instruction, "we" looked only at formal training in the dietetics field because "we needed ... someone who can work multifaceted." Furthermore, although Supervisor Smith was admittedly aware that Zimmerman had received additional training in the dietary field, and although the instruction sheet had directed Kirk not to use educational background as a basis for rating any employee if information as to this factor was not available for one employee, Kirk nonetheless used educational background in rating all the diet technicians, and the RIF ratings prepared by Kirk gave Zimmerman (and Hargrove) a relatively low score as to "job-related experience/education" for the express reason that they had "no formal training/education."

ALJ Op. p. 23. Smith, who was not Zimmerman's supervisor and had no part in her rating, testified as follows:

Q. Do you know if Barbara Zimmerman ever went to get any additional training in [the diet and nutrition] area?

A. Yes.

Q. Did she?

A. Yes.

Tr. 318. There is no further elaboration on this subject. Counsel for the General Counsel never asked Kirk if he was aware of Zimmerman's supposed additional training, and, significantly, Zimmerman never testified as to what training she had. And General Counsel failed to show that Kirk was unaware of the educational background of any of the three diet technicians. Again, the fundamental flaw in the ALJ's reasoning is that there is nothing in the record from which one can make the inference that Zimmerman should have been rated equal to or higher than Sueno—who had a four-year college degree—in the "experience/education" category. General Counsel had the burden to show that when Kirk rated Zimmerman one point lower than Sueno he was motivated by an intent to discriminate against Zimmerman be-

cause of her union activity. The record does not support that inference.

Indeed, in the purely subjective categories such as "Quality of Work," "Quantity of Work," and "Job Skills," Kirk rated Zimmerman better than or equal to the other two diet technicians. It was the categories for which objective criteria were applied—"Guest Relations," "Attendance," and "Experience/Education"—that Zimmerman fared poorly. General Counsel needed to put on some evidence that Kirk improperly applied these objective criteria: for example, evidence that the supposedly objective criteria were shams or that Kirk rated Zimmerman incorrectly under the criteria. But because General Counsel failed to put on evidence to create the inference that the rating was improper, the only inference that can be drawn from the evidence is that Zimmerman was properly rated second out of the three diet technicians. Thus, General Counsel needed to show that the decision to lay off two rather than one or none of the diet technicians was motivated by antiunion animus, but General Counsel failed to put on any evidence to show this. This failure is not surprising because counsel for the General Counsel apparently had not thought about the issue prior to the hearing; it was first brought up by the ALJ after opening argument. The ALJ wanted to clarify whether General Counsel's position was that laying off two diet technicians was unlawfully motivated. Counsel responded, "I don't take any position whatsoever. There is no charge pending on Carol Hargrove's layoff." When questioned further on the point, counsel stated, "You know, Your Honor, I think I would have to reserve the right to contend that, at least on the evidence I have."

Although our review under § 160(e) is limited, we cannot conclude on this record that substantial evidence supports the ALJ's finding that antiunion animus was a substantial or motivating factor in the decision to terminate Zimmerman. We therefore decline to enforce that part of

the Board's order. This brings us to the other issue before us: whether to enforce the part of the Board's order dealing with Mitchell's telling Zimmerman not to discuss union matters with the cooks. As we stated, this issue turns entirely on credibility findings, which we have no occasion to ignore in this case. But there are several equitable factors that argue in favor of this court forbearing to enforce this part of the order as well. *See NLRB v. P\*I\*E Nationwide, Inc.,* 894 F.2d 887, 893 (7th Cir. 1990) ("The [LMRA]'s statutory scheme interposes a court between the Board and the respondent, empowering the Board to seek the aid of equity but not disabling the equity court from exercising a complementary power of equitable restraint and forbearance."). Among those factors are the length of time between the unfair labor practice and the Board's order; the limited scope of the infraction; and, importantly, the practice related to the unsuccessful election and could have been the subject of the dismissed unfair labor charge filed by Local 743. But we need not decide on these facts whether we would forbear enforcement because again the Hospital has not argued that we should. We will therefore enforce the part of the Board's order dealing with Mitchell's coercion of Zimmerman's rights.

For the reasons stated above, the Board's request to enforce the part of its order requiring Zimmerman to be reinstated is DENIED. The request to enforce the part of the order relating to the coercion of the right to union advocacy is GRANTED.