In the
United States Court of Appeals
For the Seventh Circuit

Nos.  98-3177, 98-3683, 98-3721,
99-1097, 99-1124, 99-1382

Beverly California Corp.,
f/k/a Beverly Enterprises,

Petitioners/Cross-Respondents,

v.

National Labor Relations Board,

Respondent/Cross-Petitioner.

Service Employees International Union,
AFL-CIO, and Districts 1199P and 1199II,
SEIU, AFL-CIO,

Petitioners,

v.

National Labor Relations Board,

Respondent.

On Petitions for Review and Cross-Applications
for Enforcement of Orders of the National Labor Relations Board.
Nos. 6-CA-20188-46, et al.

Argued October 26, 1999--Decided September 13, 2000

 Before Harlington Wood, Jr., Kanne, and Diane P. Wood,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  Beverly California
Corporation operates nursing homes all over the
United States--approximately 900 at the time the
labor practices at issue in this appeal occurred.
It is avowedly anti-union, and its practices have
drawn the attention of the National Labor
Relations Board ("the Board") on no less than
five occasions over the last decade or so. Before
us in the present appeals are the Board's orders
in Beverly California Corporation, 326 NLRB No.
29 (1998) (Beverly II), and Beverly California
Corporation, 326 NLRB No. 30 (1998) (Beverly
III), in which the Board largely adopted the

findings of two different administrative law judges (ALJ) that numerous violations of the National Labor Relations Act ("the Act") had occurred at various facilities Beverly operates, and in which the Board ordered various forms of corporate-wide relief. In its petition for review, Beverly contests many of these findings, as well as the Board's chosen remedy. The Board has cross-petitioned for enforcement of its orders. Finally, the Service Employees International Union (SEIU) has petitioned to contest the Board's exoneration of Beverly in certain instances and its failure to issue a bargaining order at one facility.

As we explain in slightly greater detail below, the pertinent question for this court is whether the Board's decisions are supported by substantial evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88 (1951). With respect to the remedy that the Board chose, our review is also quite deferential. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216 (1964). In that light, we conclude that all but a few parts of the Board's orders are entitled to enforcement. We further conclude that the Board did not abuse its discretion in principle in imposing a corporate-wide remedy, but that it needs to refine the corporate-wide aspects of the remedial order and distinguish those from the parts more suitable to application at the facility level.

I

Beverly's corporate headquarters are now in Arkansas. At the time of Beverly II and Beverly III it operated 895 nursing homes throughout the United States. It used (and as far as we know still uses) a typical three-tier organizational structure, moving from the corporate level through the regional, and then down to the individual facilities. Beverly formulates its labor relations policy at the corporate level; personnel at the regional level bargain with unions over contracts and high level grievances. Each facility's own managers are responsible for day-to-day activity at the facility, and they handle front-line labor relations. Facility managers report to regional "area managers," who in turn report to the operations officials at headquarters.

In 1993, the Board found that Beverly had committed various unfair labor practices at 33 of its nursing homes, between 1986 and 1988. It issued a corporate-wide cease and desist order, which provided that Beverly should not violate the Act, which specified the ways in which Beverly had committed violations in its various

facilities, and which imposed a requirement that the cease-and-desist order should be posted at every one of its facilities. Beverly California Corporation, 310 NLRB 222 (1992) (Beverly I). On appeal, the Second Circuit concluded that the order was too broad, given the nature of the violations the Board had found, and that it did not reflect the reality of the company's central control (or lack thereof) over the facilities. Torrington Extend-A-Care Employee Ass'n v. NLRB, 17 F.3d 580 (2d Cir. 1994).

Before Beverly I was finished, the General Counsel of the Board issued a new consolidated complaint on August 20, 1991, charging Beverly with violations at another group of nursing homes (eventually, 17 facilities). ALJ Peter E. Donnelly held hearings on those matters on various dates between November 12, 1991, and March 26, 1993. In an opinion issued on June 29, 1994, he found that (1) Beverly and its nursing home operating divisions, regions, wholly-owned subsidiaries, and individual facilities constituted a single integrated business operation and a single employer, (2) Beverly had committed many unfair labor practices as charged, although in a nontrivial number of instances the General Counsel had failed to prove the alleged violations, and (3) a corporate-wide cease and desist order and a requirement of posting notices in every facility that detailed forbidden practices was called for. See 326 NLRB No. 29, attachment at 22-85. On appeal to the Board, most of ALJ Donnelly's decision was upheld, although the Board found that some of the charges he had rejected should have been sustained. With respect to remedy, it coordinated its decision with the resolution of Beverly III.

This was possible because, while Beverly II was working its way through the system, proceedings in Beverly III had begun. On June 30, 1993, the General Counsel issued a complaint in that matter, and ALJ Lawrence W. Cullen held hearings between November 30, 1993, and April 27, 1994, on charges pertaining to 11 more nursing homes in several different states. In a decision of June 12, 1995, ALJ Cullen also concluded (upon independent consideration) that Beverly was a single employer, and he upheld many (though not all) of the charges. He too recommended a corporate-wide cease-and-desist order, a posting requirement, and detailed individual relief. 326 NLRB No. 30, attachment at 51-53. On appeal, the Board also upheld the bulk of ALJ Cullen's decisions, again with a few disagreements. It also approved the system-wide orders that both ALJ Donnelly and Cullen thought were necessary: it did this through the vehicle of a single order entered in Beverly III, to which the decision in

Beverly II referred. (Although orders later than Beverly III are not before us, we note that two more proceedings have taken place in which ALJs have found that Beverly committed similar violations: Beverly Health and Rehabilitation Services, Inc., et al., JD-204-97 (Nov. 26, 1997) (Beverly IV); and Beverly Health and Rehabilitation Services, Inc., JD-40-00 (March 23, 2000) (Beverly V).)

On August 28, 1998, Beverly petitioned for review of both Beverly II and Beverly III in the Fourth Circuit; SEIU petitioned for review in the Third Circuit and in this court. The Judicial Panel on Multidistrict Litigation ("the Panel") consolidated the petitions in Beverly II before the Third Circuit, and in Beverly III before this court. See 28 U.S.C. sec. 2112(a)(3) (conferring this responsibility on the Panel). The Third Circuit then granted Beverly's motion to transfer Beverly II to this court. The Board filed cross-applications for enforcement.

II
  A.  Breadth of the Case

Before turning to the specifics of the appeals before us, a word about the scope of this case is necessary. At every step of the way, Beverly has in one way or another argued that this case is just too big to manage: the Board should not have consolidated the General Counsel's charges with respect to the various nursing homes for disposition; the geographic scope is too broad; and there are too many specific alleged problems at individual facilities to make consolidation efficient. Before this court, Beverly has complained bitterly about the page limits that were imposed upon its briefing, despite the fact that we allowed it to file a brief 40% longer than the rules normally permit. Finally, a central part of Beverly's argument on appeal is its attack on the corporate-wide order that the Board approved in Beverly III to address both cases.

These complaints are related to one another. We explain here why we find them to be without merit. A key point underlying the Board's approach to these cases is its finding--uncontested in Beverly I, but made over Beverly's opposition in Beverly II and Beverly III--that Beverly is a single employer, a single integrated enterprise with a unified labor relations policy. ALJ Cullen found the evidence on this point to be overwhelming, and we agree. (Indeed, Beverly has not challenged this finding on appeal; we mention the point for purposes of giving perspective to the broader issues it has raised, not because we are reconsidering the correctness of the

finding.) ALJ Cullen relied on Beverly's hierarchical management structure, its decision to limit the authority of area and individual facility managers by overall corporate standards, its central oversight of labor relations functions in particular, the fact that labor grievances bump up to the regional level at step three, the fact that Beverly dispatches regional human resources personnel to individual facilities the minute a union organizational effort begins, and other evidence to the same effect.

Viewed in this light, and also taking into account the mounting evidence that Beverly facilities continue to violate the law with regularity, it is hardly surprising that the Board would have considered corporate-wide relief to be appropriate. When an employer has many different facilities, all of which are affected by the same general policies, the Board is not required to proceed facility-by-facility, waiting for the next shoe, and the next shoe, to drop. It can instead require the company as a whole to eliminate the policies that lead to the commission of unfair labor practices by managers lower down on the corporate ladder. That is not to say, of course, that any particular corporate-wide order is justified or not, and we consider the one that the Board imposed here later in this opinion. But in principle, this is a tool that the Board is entitled to use. See J.P. Stevens & Co., 245 NLRB 198, 199 (1979), enforced, 638 F.2d 676 (4th Cir. 1980); Florida Steel Corp., 222 NLRB 955, 956 (1976), enforced mem., 536 F.2d 1385 (5th Cir. 1976). Nothing in Torrington Extend-A-Care, supra, is to the contrary; in that case the Second Circuit merely found that the record as of the time of Beverly I did not support corporate-wide relief.

There is no doubt that when corporate behavior as a whole is challenged the record will often contain myriad individual facts that add up to create the case as a whole. This phenomenon is not limited to labor law: mass tort claims, consumer fraud claims, and environmental claims can also involve many particularized injuries, forms of fraud, or polluted sites. But the fact of evidentiary detail is not something that prevents consolidation of proceedings, either before administrative agencies or before courts. The Panel regularly sends complex cases to a single district court for pretrial processing. The transferee court manages the litigation by creating committees of counsel, by imposing strict discovery limits, by establishing deadlines, and by using the other tools of the trade. Here too, that is what happened both before the Board and before this court. The

pressure of a large complex proceeding puts a premium on good organization and efficient use of time and space, but that is a good thing, not a bad thing. Consolidation allows for consistency in decisionmaking; it allows both the agency and the reviewing court to see the big picture and not to be misled by fragmentation; and it saves resources for all concerned.

Here, both the Board and Beverly had to present their appeals under the same rules: the same page limits and the same standard of review. Even when it filed its brief, Beverly was apparently under the misapprehension that more is always better when it comes to briefing. It complained, for example, that the page limits imposed by this court precluded it from listing every issue pertaining to each of 42 nursing homes in its statement of the issues, and instead "forced" it to offer what it gave us: the concise and helpful statement that it was challenging whether substantial evidence supported the Board's findings in numerous respects. A listing of all those issues would only have made the brief tedious to read, because everything would have been repeated later in the brief in the discussion on the merits. Furthermore, the substantial evidence standard of review should guide appellate counsel in the selection of issues that deserve presentation to the court of appeal. Arguments to the effect that the ALJ should not have found certain witnesses to be credible are, to put it bluntly, almost never worth making. In short, given the scope of this case and the kinds of arguments this court is entitled to consider, the case was manageable within the limitations we imposed.


   B.  Questions Presented

   Having disposed of Beverly's complaints related to the general scope of the case, we turn to the substantive questions each of the parties has presented on appeal. Beverly raises three basic points: first, as noted, that there are 42 findings of unfair labor practices contained within Beverly II and Beverly III that are not supported by substantial evidence; second, that the Board erred in Beverly III by imposing a cease-and-desist order on all 895 of its facilities rather than just the 27 facilities where violations occurred; and third, that the Board erred in Beverly III by ordering Beverly to post remedial notices at all 895 of its nursing homes, rather than simply posting notices at individual homes that addressed the individual violations that occurred there. SEIU's appeal concerns three particular nursing homes and the remedial order in Beverly II: it claims that the

Board should have issued a bargaining order against Beverly to remedy the unfair labor practices it found at the East Moline Care Center; that the Board should have found that employee Dorothy Theunick was discharged by East Moline based on her union activities; that it should have found that Beverly withheld a scheduled wage increase at Richland Manor based on the employees' refusal to withdraw an unfair labor practice charge; and that there should have been a separate nationwide remedial order entered in Beverly II. The Board defends its orders in all respects and seeks enforcement of them.

## C.  Standard and Scope of Review

We have already alluded to the fact that our review of the Board's decisions is deferential. The Act itself makes the point clearly by specifying that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." NLRA sec. 10(e), 29 U.S.C. sec. 160(e). "Substantial evidence," the Supreme Court has explained, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). See also American Grain Trimmers v. Office of Workers' Compensation Programs, 181 F.3d 810, 817 (7th Cir. 1999) (en banc). Thus, as long as there is "substantial" evidence in the record supporting the Board's opinion, it does not matter that there is also evidence in the record that might support Beverly's or SEIU's view of the case. Furthermore, as we pointed out in NLRB v. Grancare, Inc., 170 F.3d 662 (7th Cir. 1999) (en banc), we defer to the Board's interpretation of the statutes it is charged with administering unless its view is arbitrary or capricious. Id. at 666. Adding into the balance the fact that we will virtually never second-guess a basic credibility determination, it is clear that those who challenge the Board's determinations have a difficult task in front of them.

Before turning to a more detailed discussion of the facilities at issue in the Board's two proceedings, we wish to make two points. First, a review of the two ALJ opinions on which the Board relied demonstrates clearly that each ALJ carefully reviewed the evidence before him before finding the violations that he did. On numerous occasions, each ALJ concluded that the General Counsel had supported some of the charges and had failed to support others. A few examples suffice to illustrate this point. One charge made in Beverly II pertained to the discharge of Gladys Hahn, who worked for a period of time at the Mark

Twain Hospital Facility in San Andreas, California. Hahn was unhappy about the way that the managers of Mark Twain handled the supply system, and the managers instructed her not to involve other employees in her complaints about that system. The General Counsel alleged that this violated sec.sec. 8(a)(1) and (3) of the Act, but the ALJ found the charge unsubstantiated, largely because he found that Hahn was a supervisor not entitled to protection under the Act. 326 NLRB No. 29, attachment at 37-40. Also in Beverly II, the ALJ considered a variety of charges relating to the Slayton Manor Nursing Home, in Slayton, Minnesota, including allegations that management posted an unlawful no-solicitation rule, solicited and adjusted employee grievances, created the impression of surveillance, and threatened some employees with discipline for speaking about the union or failing to support Beverly's position against the union's organizational efforts. The ALJ found that the threats of discipline did not violate the Act, because the threatened nurses were supervisors; that the no-solicitation rule did violate the Act; that the facts did not show that an impression of surveillance was created; and that a manager had improperly solicited and adjusted employee grievances during an election campaign. 326 NLRB No. 29, attachment at 46-47. The discussions ALJ Cullen gave with respect to the William Penn facility in Lewiston, Pennsylvania, 326 NLRB No. 30, attachment at 13-15, and with respect to the Deltona Health Care Center, Deltona, Florida, id. at 18-24, are similarly balanced. And these are just examples. No one was receiving rubber-stamp treatment in these cases.

The second point is that, as the Board has pointed out in its brief, Beverly has not challenged a significant number of the Board's findings of particular violations at particular facilities. We summarize them here:

Slayton Manor Nursing Home: violation of sec. 8(a)(1), overbroad no-solicitation rule.

Sanger Hospital: violation of sec. 8(a)(1), coercion and threats to employee Garza.

Duke Convalescent Facility: (a) violation of sec. 8(a)(1), threats of discharge to prounion employee Johnson; (b) violation of sec.sec. 8(a)(1) and (3), from warning, suspending, and then discharging Johnson; (c) violation of sec. 8(a)(1), removal of union materials from facility.

William Penn Nursing Center: violation of sec. 8(a)(1), oral harassment of prounion employee

Black.

Deltona Health Care Center: various violations of sec. 8(a)(1), including threats of loss of licenses and jobs for engaging in union activity, interrogations, and impression of surveillance. East Moline Care Center: several violations of sec. 8(a)(1), including threats to sell rather than face unionization, threats to call police for lawful handbilling, and interrogation.

Garden Terrace Nursing Center: violations of sec. 8(a)(1) by interrogation, impression of surveillance, threats of layoff, and permitting only antiunion campaigning on election day.

Gulf Coast Convalescent Center: violations of sec. 8(a)(1) by interrogation of employee Rogers, and by prohibiting employees from wearing union insignia while allowing other kinds of pins.

Mount Lebanon Manor Convalescent Care Center: violation of sec. 8(a)(5) by failing to furnish relevant bargaining unit information to union.

Danbury Pavilion Health Care Facility: violation of sec. 8(a)(5) by unilaterally ceasing to pay "short pay" to nurses.

Beverly Health Care Center: violation of sec. 8(a)(1) by telling two employees they would be discharged if they refused to cross a picket line and joined a strike; violation of sec. 8(a)(3) by promising one employee that disciplinary warnings would be rescinded if she stopped participating in the strike, and then discharging her when she refused.

Carpenter Care Center: violations of sec.sec. 8(a)(5) and (1) by unilaterally changing a medication reimbursement procedure and by refusing to furnish information to the union.

Valley Care and Guidance Center: violations of sec. 8(a)(1) in various ways, including soliciting an employee to sign a decertification petition, interrogation, and demanding loan repayment.

The Board argues, and we agree, that Beverly has waived its defenses to these findings and that it is entitled to summary enforcement with respect to them. As established findings, furthermore, these form part of the background against which we will assess the remedy.

III

   We now turn to a brief discussion of the unfair labor practices the Board found at each facility.

The background legal principles are well established. Section 7 of the Act gives employees the rights of "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. sec. 157. Section 8(a), to which we have already referred a number of times, defines certain practices that are forbidden to an employer because they would interfere with the employees' sec. 7 rights. Thus, sec. 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their sec. 7 rights. 29 U.S.C. sec. 158(a)(1). Section 8(a)(3) makes it illegal for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. sec. 158(a)(3). Section 8(a)(4) makes it an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony" in proceedings related to the Act. 29 U.S.C. sec. 158(a)(4). Finally, sec. 8(a)(5) makes it illegal for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. sec. 158(a)(5).

## A.   Instances Where Evidence Is Lacking

We have carefully reviewed the administrative record and have found, for the most part, that the Board's findings in both cases are supported by substantial evidence. In three instances, however, we have concluded that particular findings must be reversed. We review these first, before turning to our consideration of the facilities and findings that we believe do not require revisions.

## 1.   Stroud Manor (Beverly II)

With respect to Stroud Manor, the General Counsel's complaint alleged that Beverly had violated sec. 8(a)(1) as follows:
. . . by soliciting employee complaints, threatening employees, and promising benefits and improved terms and conditions of employment to Respondent's employees if they rejected [the Union] as their collective-bargaining representative; promising to redress an employee's grievance concerning tuition reimbursement; threatening employees with less favorable working conditions if they selected the Union as their bargaining representative; threatening employees that Respondent would no

longer grant favors if the employees selected the Union as their bargaining representative; and threaten[ing] employees with less favorable working conditions if they selected union representation by telling the employees that an entire day must be requested if the employee has a medical appointment during the workday.
326 NLRB No. 29, attachment at 73.

The ALJ upheld some of these allegations and rejected others. He found, and the Board agreed, that Jay Begley and Greg Thomas, regional human resources representative for Beverly, promised to fix a tuition reimbursement problem for employee Jeanette Drake, and did so with the assistance of facility administrator Mary Lou Shannon. He further found that under the circumstances, "when Drake was approached by Shannon during the election campaign with a promise to expedite this payment, such remarks violate[d] Section 8(a)(1) of the Act." Id. at 74. The ALJ also found other forbidden promises of benefits during the campaign that violated section 8(a)(1). On the other hand, he rejected the charge that a letter dated July 23 that Shannon distributed that urged employees to vote against the Union constituted an unlawful threat of less favorable working conditions if the union won. He rejected the claim that the director of nursing, McGonnigle, unlawfully threatened employee Jimenez with less favorable working conditions by telling her she would need a full day off for medical appointments. He found a violation of sec. 8(a)(5) established in the facility's withholding of all wage increases for the year 1992 without notice to the Union, in contravention of its practice in years past.

While most of these findings, both pro and con, are supported by the evidence, we agree with Beverly that Begley (as opposed to Thomas and Shannon) did not make an improper promise or take improper action with respect to Drake's tuition reimbursement problem. All Begley did was to hold a meeting with the licensed practical nurses (LPN) to explain Beverly's position against the Union. He compared the salaries the LPNs were making with those that LPNs working at unionized facilities earned. He then asked for questions, and Drake responded with her inquiry about why Stroud Manor was taking so long to reimburse employee tuition bills. Begley replied that the time lags were because of the company's financial problems, but that its situation was stabilizing and he thought the speed of reimbursements should improve.

The ALJ saw this as the solicitation of grievances, which raised a rebuttable presumption of a violation of sec. 8(a)(1). But employers are

allowed to conduct anti-union campaigns if they wish. See NLRA sec. 8(c), 29 U.S.C. sec. 158(c); NLRB v. Gissel Packing Co., 395 U.S. 575, 617 (1969); BE & K Const. Co. v. NLRB, 133 F.3d 1372, 1376-77 (11th Cir. 1997). The only thing that is forbidden is an unlawful coercive promise or threat. Employers are also permitted to offer opinions about matters that are not within their control, because those statements are unlikely to be perceived as threats or promises. See Gissel, 395 U.S. at 618. Here, both sides agree that Begley merely made a general statement about the condition of the company. We do not see in his response the kind of "promise" of help with Drake's own tuition problem that is forbidden. Shannon, of course, is another matter. The ALJ found as a fact that Shannon affirmatively sought out Drake, told her she would look into the delay, did so, and promised Drake she would have a check within two weeks. But Begley did no such thing, and we find that the Board had no other substantial evidence on which to base a conclusion that Begley's actions constituted a separate violation of sec. 8(a)(1).

Beverly also challenges the finding of a violation of sec. 8(a)(1) with respect to Thomas's conversation with Drake. Unlike Begley, however, Thomas was conducting one-on-one meetings with the LPNs. In these meetings, he introduced himself, explained the company's position, encouraged them to vote, and asked if they had any questions. When he gave Drake this invitation to speak, she raised the tuition problem with him. Thomas testified that "he may have told Drake he would look into it for her, but has no recollection of doing so except to the extent that he may have mentioned it to Mary Lou Shannon, the administrator at the facility." 326 NLRB No. 29, attachment at 73. That is, however, a rather large exception, given the fact that it was the very next day that Shannon approached Drake about the problem. In our view, this is enough to distinguish Thomas's case from Begley's, and enough to support the ALJ's conclusion that Thomas was promising a specific benefit.

Last (for Stroud Manor), Beverly argues that the Board erred in finding a violation of sec. 8(a)(5) in the failure to give the employees a wage increase while negotiations were taking place. It attempts to refute the finding that Stroud Manor/Beverly had established a pattern of annual wage increases by showing that in 1989 it gave 3%, in 1990 it gave 40 cents across-the-board in March and another 30 cents across-the-board in September, and in 1991 it gave a 4% anniversary raise. This evidence tends more to support the ALJ's conclusions than to undercut

them, in our view, even though the 1990 figures are not expressed in percentage terms. We reject its challenge to this finding.

## 2. Wyoming Valley (Beverly II)

The charges with respect to the Wyoming Valley facility pertained only to its treatment of Christopher Tausch, an employee who was an acknowledged "colonizer," or union activist who had taken the job solely for the purpose of helping to organize the workforce. See NLRB v. Town & Country Electric, Inc., 516 U.S. 85 (1995); Starcon, Inc. v. NLRB, 176 F.3d 948 (7th Cir. 1999). At the time he was hired as a nurse's aide, Tausch did not disclose his union identity to Beverly and he lied about his level of education on his application (he was in fact a 1990 graduate of Rutgers University with a scholastic concentration in labor studies). It was his intention to obtain the names, addresses, and telephone numbers of the Wyoming Valley employees in order to solicit them in the Union's organizing effort.

On the evening of March 27, 1991, during a work break, Tausch went into the kitchen area of the dietary department. While there, he first spoke with employee Charles Weitz about the Union and asked Weitz for the names and addresses of two other dietary employees. Weitz told him that the information was on a list located in the office of the department manager, Richard Rutkowski, who was absent at that time. Tausch went into Rutkowski's office, sat down at his desk, and copied from a list taped to the wall the names and telephone numbers of the people he wanted to solicit. Later that night Rutkowski returned, and Weitz reported to him that "a nurse" had been in his office writing down telephone numbers. The next day, Tausch and another person visited Weitz at his home and asked for his personal support for the Union and his help in soliciting others. Weitz was not interested; at that point, Weitz revealed to Rutkowski that "the nurse" was Tausch and he complained about being bothered.

Rutkowski consulted with his supervisor, Nancy Wilson, about what to do. Wilson kicked the problem up to the facility administrators, and the head administrator, Donna Connery, decided that Tausch should be terminated for unauthorized entry into the restricted dietary department area and for removing confidential employee information (i.e., the telephone numbers and addresses) from the premises. As a precaution, Connery also notified Wayne Chapman, Beverly's regional director for human resources, of what she planned to do; Chapman concurred in her

decision.

The ALJ found (correctly anticipating the Supreme Court's decision in Town & Country Electric) that Tausch was an "employee" under the Act notwithstanding his status as a paid union organizer. 326 NLRB No. 29, attachment at 56. He concluded, however, that Tausch's activity was not protected and thus that his discharge did not violate sec.sec. 8(a)(1) and (3). The Board reversed the ALJ on this point, finding that the telephone numbers were not "confidential" (because they were available out in the open by the nurses' station), that the confidentiality rationale for firing Tausch was thus pretextual, and that he was really fired because he was engaging in union activities. 326 NLRB No. 29, at 3-4.

We agree with Beverly that the ALJ got this one right. It is of course true that an employer violates sec. 8(a)(3) by retaliating against employees for engaging in union activities. See, e.g., NLRB v. Louis A. Weiss Memorial Hosp., 172 F.3d 432, 442 (7th Cir. 1999). But an employer does not violate the statute if it can show that it would have taken whatever action it took for legitimate reasons, whether or not the employee in question had engaged in union activities. Id. Here, it is undisputed that Tausch did not obtain the telephone numbers and addresses in an open and unobjectionable way, such as by copying them from an employee directory available to everyone, or even by sitting down at the quasi-public nurses' station and writing them down. Instead, he sneaked into Rutkowski's office when Rutkowski was away, jotted them down, and slipped away again. Beverly was entitled to take into account the totality of the circumstances surrounding Tausch's behavior. There is no evidence at all to suggest that it would have tolerated this behavior from committed union opponents. In our view, therefore, the Board had no evidence upon which to rest its reversal of the ALJ's conclusion here, which was based on the ALJ's own opportunity to observe the witnesses and to make credibility assessments. The conclusion that Beverly committed violations at Wyoming Valley must therefore be reversed, as there was nothing other than the Tausch incident at stake.

3.  Duke Convalescent Facility (Beverly II)

This was another facility for which the General Counsel brought a substantial number of charges. Some of the Board's findings of violations, as noted above, are not challenged on appeal: (1) administrator Eigen violated sec. 8(a)(1) when he threatened prounion employee Amy Johnson with

discharge; (2) Eigen and regional human resources representative Martinez violated sec.sec. 8(a)(3) and (1) by warning, suspending, and ultimately discharging Johnson; and (3) food service manager Pereira violated sec. 8(a)(1) by removing Union paraphernalia from the facility.

Beverly does, however, challenge other aspects of the Board's findings with respect to Duke Convalescent. First, it contests the Board's finding (reversing the ALJ) that Steve Marek, a labor consultant Beverly had hired to assist management at the facility, violated sec. 8(a)(1) when he spoke to Valerie Faulkner and Harry Brooks, two known Union sympathizers, about what they thought a union would do and (in Brooks's case) how he was going to vote in the election. The ALJ had concluded that these conversations were protected, on the ground that there was nothing coercive or improper in asking these questions to open Union sympathizers. See Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB, 760 F.2d 1006, 1009 (9th Cir. 1985) (affirming Rossmore House, 269 NLRB 1176 (1984)). The Board explained its reversal of that finding by the fact that even open union adherents can be subjected to invalid coercive interrogation (a proposition that Rossmore House, on which Beverly principally relies, also acknowledges). An employer is not free to probe "directly or indirectly into [an employee's] reason for supporting the union." TRW-United Greenfield Division v. NLRB, 637 F.2d 410, 418 (5th Cir. 1981). If an interrogation is "coercive in nature" it makes no difference that the attempt at coercion was not successful. Id.; accord NLRB v. Brookwood Furniture, 701 F.2d 452, 463 n.35 (5th Cir. 1983). While we agree with Beverly that this is a close point, we think the Board--which was able to consider the actual remarks made to these employees--had evidentiary support for its conclusion and thus we have no basis on which to reverse it.

Beverly's second challenge relating to Duke Convalescent relates to the section 8(a)(1) finding based on administrator Eigen's statement to Faulkner that she had missed a meeting in which employees were reminded that speaking about Union activity was prohibited in front of residents or on the nursing floor and that it had to be restricted to the break area. He also told her in the same conversation that he would not tell her how to vote, even though he knew where she stood. Eigen denied making these statements, but the ALJ chose to believe Faulkner's account and it is on that basis that we evaluate the charge. The ALJ found, and the Board agreed, that this was enough to create the impression of surveillance in Faulkner. He also found that the

restriction of organizing to the breakroom was unlawful because it limited such activity to a greater extent than was permissible under the law.

As Beverly did in its brief, we take the two points separately: surveillance, and undue restriction of areas for organizing. We agree with Beverly that the conclusion that Faulkner would have thought she was under surveillance finds no support in the evidence. The ALJ wondered how Eigen would have known she was pro-union if surveillance had not been underway, but he provided the answer to his own question later on in his opinion: "In reviewing the record, it is clear that Faulkner was among the most active and vocal of the union supporters and that her union sentiments were well known to management, including Eigen and Leonard." 326 NLRB No. 29, attachment at 63. The Board's only response to this problem in its brief is to suggest that Eigen did not know Faulkner was an active Union supporter at the time he approached her, and thus she could only have concluded that she was under surveillance. But there is no serious evidence to support that hypothesis, and speculation does not amount to substantial evidence. The ALJ found that Faulkner was an active Union supporter "from the beginning of the Union's organizational effort in early January 1991," id. at 62, which would mean that her Union identification would have been known by January 26, 1991, when the conversation with Eigen took place. Id. at 61. We therefore agree with Beverly that the evidence does not support a finding that the company violated sec. 8(a)(1) by creating the impression of surveillance in Faulkner.

Evidence does support the other part of the Board's finding, however, which was that Eigen's advice on where organization activities could take place was too restrictive. Indeed, Beverly itself seems to concede this in its brief, when it dismissively states that Eigen cannot be criticized for "[h]is failure to meticulously identify each and every non patient-care area." Beverly Brief at 32 n.11. But it is clearly one thing to tell the employees that they must keep their organizational activities away from the patients, and another to tell them that only the breakroom is available. Patients did not have access to locker rooms, the kitchen, or "med rooms," and the employees therefore had the right to engage in organizational activities there as well. See Beth Israel Hosp. v. NLRB, 437 U.S. 483, 506-07 (1978).

Of the other violations the Board found at Duke Convalescent, the only one Beverly challenges is the finding that it violated sec. 8(a)(3) by

requiring Faulkner to obtain a doctor's note before she returned to work, when she had experienced one bout of nausea early in her pregnancy. Despite the fact that her doctor gave her a note saying that she could work until her first prenatal visit, assistant director of nursing Leonard refused to put her on the schedule until she obtained a formal medical certificate. His ostensible reason was concern for her baby, but the evidence showed that other employees were able to work during pregnancy without being required to furnish certifications. Furthermore, Faulkner left only once because of nausea. The Board was entitled to treat this action as discriminatory and the explanation as pretextual.

## B. Other Facilities

Our discussion of the Board's findings at the remaining facilities will be briefer. We find that substantial evidence supports its conclusions with respect to these locations, and we refer those who would benefit from a more complete discussion of the evidence to the opinions of the Board and the attached opinions of the two ALJs.

### 1. Pioneer Place (Beverly II)

At Pioneer Place, management decided to create an employee council that was to be composed of employees and managers. Section 8(a)(2) of the Act declares that it is an unfair labor practice for an employer to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. 29 U.S.C. sec. 158(a)(2). Section 2(5) of the Act defines a labor organization as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. sec. 152(5).

Under this definition, the Board could reasonably have concluded that the council would constitute a labor organization. There was evidence that (1) the unit employees were going to participate in the council, (2) the council was to have existed at least in part for the purpose of dealing with the employer, and (3) those dealings would have concerned "grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." Electromation, Inc. v. NLRB, 35 F.3d 1148, 1158 (7th Cir. 1994). Furthermore, the Board could

have concluded that the council would be under Beverly's domination, because it was the creature of the facility's management.

### 2. Fountainview Place (Beverly II)

On the day before a representation election, Beverly's human resources representative contacted the union organizer, Kidwell, to find out which employees would be the designated Union observers for the election. Kidwell did not identify them by name, but he did say that there would be one aide on each of the two shifts. In fact, it was Nurse's Aides (NA) Lillie Davis and Kastle Gannon who acted as Union observers. As a result, they were tardy in reporting to their workstations on the day of the election. Nothing was said to them at the time, but facility management disciplined them four days later. The Board found that the discipline was based on anti-union animus and thus violated sec. 8(a)(3). The record also showed that Beverly knew why these two were late.

Beverly makes much of the fact that Kidwell only stated two "aides" would act as observers; he did not specify that the observers would be NAs. However, as the ALJ correctly noted, Fountainview's Director of Nursing testified that she knew the day prior to the election that two NAs would be used as observers. 326 NLRB No. 29, attachment at 27; Beverly Supp. App. at 32. Therefore, Kidwell's precise wording is irrelevant. Beverly also argues that it needed to know the aides' precise identities before their absence, so that it could prepare adequately. But it did not say this to Kidwell when he responded to the inquiry, nor did it explain why it was not enough to know that a couple of NAs were going to be a little late reporting for duty. Substantial evidence supported the Board's finding of a violation.

Beverly also challenges the Board's finding that Joyce Williams, a member of Beverly's labor relations staff, made a threat against Lillie Davis on the day of the Union election. The ALJ credited Davis's unrebutted testimony as to the content of Williams's remarks, and found that, taken in context, the remarks amounted to "unspecified threats of reprisal." 326 NLRB No. 29, attachment at 28. The ALJ was entitled to make these credibility determinations, and we will not disturb them.

### 3. Liberty House Nursing Home (Beverly II)

Peggy Urban, a long-time employee and active Union participant, was discharged after a new

employee claimed that she saw Urban hit a patient. Urban had cared for the patient for some time, and there was substantial evidence before the Board tending to show that the patient held Urban in high regard. Upon investigation, there was no evidence of physical abuse on the patient, and the patient herself could not confirm that she had been hit (though she was not in full command of her faculties). Urban denied any abuse, and another aide (Nicely) backed up her account to the extent of confirming that there was no slapping.

The ALJ found that Beverly's investigation of the incident had been cursory and that Urban had been discharged solely on the basis of the unsupported, uncorroborated observations of one individual. He concluded, and the Board agreed, that Liberty House "simply embraced the opportunity to rid itself of an active union adherent." 326 NLRB No. 29, attachment at 30. Beverly responds only that other employees were sometimes discharged for patient abuse (which we do not doubt is true), but that does not respond to the specific evidence on which the Board relied. Its inference that the real reason for Urban's discharge was anti-union animus must therefore stand.

4. Mount Lebanon Convalescent Center (Beverly II)

Problems arose at Mount Lebanon when facility administrators decided to implement a new master schedule without consulting with the Union. The collective bargaining agreement (CBA) contained general language giving the company the right to "direct, control, and schedule its operations work force." The Board agreed with the ALJ's finding that Mount Lebanon's action violated sec.sec. 8(a)(5) and (1), because it changed the schedule without bargaining in a way that reduced the hours and thus the wages of unit employees. In such circumstances, unless there is a clear waiver of the Union's right to bargain over such matters in the CBA, unilateral action is precluded.

The Board was correct to conclude that waivers of statutorily protected rights must be clearly and unmistakably articulated. See Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708 (1983). Even though this contract says that the company may "schedule its operations," it does not say anything about schedule changes that affect hours and wages (as opposed to simply scheduling employee A for one shift and employee B for another one). A clause this general is not enough to support a finding of waiver of the Union's

sec. 8(a)(5) rights. Cf. Bonnell/Tedegar Indus. v. NLRB, 46 F.3d 339, 346-47 (4th Cir. 1995) (Union did not unequivocally waive right to bargain over Christmas bonus); NLRB v. New York Tel. Co., 930 F.2d 1009, 1012 (2d Cir. 1991) (provision in CBA authorizing Union access to personnel records with employee's permission did not unequivocally waive Union's right to access records without permission if necessary to process grievances).

5.  West Haven Facility (Beverly II and III)

This case also involved a change in hours and a violation of sec. 8(a)(5). Facility administrator Robert Haswell notified the Union that West Haven was going to change the break times of the dietary employees, and it did so. The Board found that the company had unilaterally implemented this change, without giving the Union a chance to bargain. In this instance, rather than relying on a "management rights" clause, Beverly argues that it was willing to bargain with the Union but the Union never attempted to do so. The evidence to which it points, however, does not support that interpretation; it shows only that the employees were told their break times were going to change, and that they later filed grievances about it. Beverly Brief at 40; Beverly Supp. App. at 293-309. The record shows that the break schedule was changed "several days" after the announcement, and the Board was entitled to conclude that this was not enough time for bargaining to take place. Evidence also supports the finding, uncontested by Beverly, that the company violated sec. 8(a)(5) by refusing to give the Union a list of the names, addresses, and rates of pay for all current, regularly scheduled Registered Nurses (RNs) and Licensed Practical Nurses (LPNs). The Union needed this information to evaluate the company's claim that many of these nurses were independent contractors rather than employees.

6. Beverly Manor Convalescent Hospital, Monterey (Beverly II)

Beverly Manor (Monterey) issued a warning to Nelia Aldape, a Certified Nurse's Assistant (CNA) regarding a complaint that she had mistreated a patient (essentially by being rude to her). Aldape was an active participant in a Union organizing campaign. When the administrator of the facility, Susan Chavis, alerted Beverly's area manager, Ronald McKaigg, to Aldape's conduct, he determined that the infraction was actually a dischargeable offense; the matter was reopened and Aldape was discharged. In addition, when Chavis learned that a petition was being

circulated on behalf of the Union, she summoned help from McKaigg, who addressed a meeting of the employees at the facility and asked them why they were starting problems. He also told them that he did not like unions and he recounted an incident when he crossed a picket line and was later beaten up and had his car vandalized. The employees responded by airing some grievances.

The Board (overruling the ALJ on this point) found that McKaigg's comments violated sec. 8(a)(1), because the meeting involved coercive interrogation and appeared to be illegal surveillance of the employees' Union activities. Beverly notes that there must be something coercive about the interrogation, see NLRB v. Champion Laboratories, 99 F.3d 223, 227-28 (7th Cir. 1996), and it claims that there was nothing wrong in McKaigg's "rhetorical" questions and statements of opinion. The Board, disagreeing, construed McKaigg's remarks as coercive. This strikes us as the kind of question of judgment on which deference is required; merely to say that there was another way of looking at the evidence cannot carry the day for Beverly.

As for Aldape, Beverly argues that it met its burden of showing that she would have been discharged even if she had never engaged in Union activities. Although it argues that the finding of the California Department of Health Services that Aldape was indeed guilty of patient abuse is helpful to it, the Board correctly responds that this cannot be the case, because the findings of the state licensing agency issued after Beverly discharged her. At most, that fact would affect the proper remedy. The ALJ found that there was "clear and convincing evidence"--not just substantial evidence--that Aldape's discharge was motivated by her Union activity. The company's own behavior showed that it did not regard her rudeness to the patient as grounds for discharge, until after McKaigg intervened; it gave her only a warning and then re-opened the matter. Furthermore, director of nursing Asfoor directly told Aldape that her suspension was related to her union activity (a fact not only established by Aldape's testimony, but also corroborated by that of another employee). That is plenty to support the Board's conclusions.

7.  Slayton Manor (Beverly II)

In this facility, regional human resources manager Barbara Katella invited the employees to contact her about work-related problems. Even though she did not in the final analysis give the employees any benefits they did not already enjoy, the Board found that she would not have

acted as a facilitator if there had been no pending union petition at the facility. On that basis, it found a violation of sec. 8(a)(1). (It also made the uncontested finding that Beverly posted an unlawfully broad no-solicitation rule at the facility, as noted above.)

During a union organizing campaign, the employer must conduct "business as usual" with respect to existing personnel policies and practices. NLRB v. Exchange Parts Co., 375 U.S. 405, 408-09 (1964). The Board was entitled to find that intervention on behalf of the facility's employees by a mid-tier corporate manager was a benefit beyond "business as usual." Beverly has not offered any evidence to show that employees who received help from Katella would have gotten the same benefits in the same time frame. We are thus not persuaded that the finding must be overturned.

8.  Kewaunee Health Care (Beverly II)

No one disputes that the initial step taken here by the facility administrator, Steven Bavers, was unlawful. In the midst of contract negotiations that were going on at the facility, Bavers issued a memorandum telling the employees that they were forbidden from distributing informational pamphlets. A day later, after lawyers were contacted, the facility (through the director of nursing, Kathy Zuege) issued a second memorandum stating that leafletting was permissible if there was no patrolling or blockage of access. The new memo made no reference to the earlier memorandum, but instead purported only to be a general statement of the company's views on leafletting.

The Board found that the second memo did not cure the first, which standing alone amounted to an unfair labor practice. Some employees still did not leaflet, even after the second memo, because they were afraid that they might violate the company's rules. Beverly tries to portray this as a case of quick correction and no harm, but the record showed otherwise, and the Board's conclusion that a violation had occurred did not go beyond the boundaries of that evidence.

9.  Richland Manor (Beverly II)

At Richland Manor, the General Counsel's complaint alleged that Beverly had violated sec.sec. 8(a)(1) and (4) by refusing to pay RN employees a scheduled wage increase, denying RN employees the use of established internal complaint procedures to file a grievance, and conditioning payment of their wage increase on a

withdrawal of unfair labor practice charges filed by the Union. The ALJ found that the evidence did not support a finding that the wage increase was withheld because charges were filed and testimony given to the Board. The ALJ also found that Beverly did not violate section 8(a)(1) through administrator Poltarack's statement at a May 1, 1991, meeting asking the nurses to seek withdrawal of the unfair labor practice charges in order to receive the wage increase. On this point, the Board disagreed and found a violation. Even though the nurses themselves were not bargaining unit employees, such an act could chill Union activism of covered employees.

The wrinkle in the case was this: everyone agreed that the company did not put the wage increase into effect in January, and that it later did so in June, retroactive to January 1 without requiring the charges to be withdrawn. But, as the Board found, during the six-month interim, employees might well have felt deterred from supporting the Union while they did not know what the company ultimately would do. In addition, there is no precedent that requires a company to follow through with its threats in order to violate sec. 8(a)(1)--that is completely inconsistent with the well established fact that threats themselves can be an unfair labor practice. See, e.g., Central Transport, Inc. v. NLRB, 997 F.2d 1180, 1190-91 (7th Cir. 1993) (supervisor's threats to close down plant were unfair labor practice despite supervisor's lack of authority to effect plant closure).

We also find without merit SEIU's argument that the Board should have found that the wage increase was illegally withheld from the nurses at Richmond. The company did finally grant the increase, and it made the grant retroactive. As a matter separate from the chilling effect argument we have just addressed and with respect to which the Board found a violation, there is nothing to the wage increase point.


10.  Beverly Manor, San Francisco (Beverly II)

At Beverly Manor, San Francisco, Enid Begay was the facility administrator and Rubin Logan was the director of nursing. On May 7, 1991, Johnny Scott was hired as a certified nurse's aide. Shortly thereafter, Logan questioned Scott about his feelings toward the Union at the facility. Scott replied somewhat negatively, saying that it was necessary to be in the Union to work there and that he had some prior negative experiences with unions. Logan then asked Scott if he would support a decertification petition. Scott repeatedly refused to do so, and Logan criticized

him continuously. (It appears that Logan was generally unpleasant; he treated some other employees poorly as well and even spit at one.) Logan finally fired Scott for refusing to participate in a decertification effort--an action that the Board found to be a violation of sec.sec. 8(a)(3) and (1).

Beverly argued that it should not be responsible for a character like Logan, because Logan was behaving in a way that was detrimental to its interests in maintaining harmonious relationships with its employees. But, for better or worse, Logan was Beverly's managerial employee, and the Board was not holding Beverly responsible for Logan's manners. Instead, it held Beverly responsible for Logan's act of firing Scott, which was within his authority as director of nursing. This finding was well supported by the evidence, and no principle of agency law exonerates Beverly here.

11. Carpenter Care Center (Beverly II)

The Board found two violations at Carpenter Care. The first was based on disciplinary warnings. Timecard violations had been going on at the facility from at least January of 1991, with only one warning issued. When July of 1991 arrived, however, the Union informed management that informational picketing was scheduled to take place on July 18. On the latter date, along with the employee paychecks, the supervisor gave disciplinary warnings to 26 employees for timecard violations. Beverly claims that the warnings just happened to be meted out on July 18 because it was payday, and that the reason they came out of the blue then was because a new supervisor had just come on the scene. But neither the ALJ nor the Board was compelled to accept that explanation, and neither one did. Instead, they found that the warnings were motivated by a desire to interfere with union organizing. This was a permissible inference from the evidence.

The second violation the Board found at Carpenter Care was based on a discharge. The Union filed a complaint to initiate an Occupational Safety and Health Administration (OSHA) safety investigation at the facility. OSHA responded and made plans to come and videotape the way in which residents were lifted and transferred by employees. A team that included the director of nursing asked Olive Wells, a patient, if she would sign a release consenting to be videotaped. Wells seemed to be worried about a government agency coming into the facility and indicated an interest in speaking to her daughter before signing the form. Employee

Allison Reaves learned that Wells was upset about the exchange, and she told Wells that it would be "fine" if she signed the release. Carpenter Care's management then suspended Reaves, claiming that she yelled at Wells. Reaves denied the allegation.

The Board found that Reaves' comment to Wells fell within the scope of Union activity, because the union had initiated the OSHA investigation. (This is another instance in which the Board disagreed with the ALJ, which is naturally within its prerogative to do.) It then decided that her suspension (which was later downgraded to a written warning and instruction on residents' rights, after she filed a grievance) was a violation of sec. 8. Beverly offers no serious argument against this, except to say that Reaves was not furthering any Union objective when she spoke with Wells. This is yet another instance where the inferences drawn from specific facts can go either way, and thus where we must defer to the Board.

## 12. Valley Care and Guidance Center (Beverly II)

This part of the story began with employee Helen Williams going to Carolyn Hankinson, the facility administrator, to ask how she could go about getting rid of the Union. Hankinson passed the inquiry along to Rod Panyik, the director of human resources, who responded to Hankinson in a letter that laid out the options (a decertification election and a withdrawal of representation based on "objective considerations"). Hankinson explained this to Williams and gave Williams model language to be used in a decertification petition that might be circulated among the employees. Hankinson also told Williams that she would "stand by her," and was as good as her word. Hankinson understood that Williams wanted moral support, and she warned Williams that company property could not be used for the effort. But Hankinson personally drove Williams to the home of another employee, where both Williams and Hankinson urged the employee to sign the petition. Williams collected a substantial number of signatures, and after she delivered them to Hankinson, Hankinson wrote to the Union representative and announced that they were withdrawing recognition.

The Board found that the decertification petition was unlawful because of the active role Hankinson played in its drafting and circulation. Beverly argues in response that several other employees had also collected enough signatures to show that the decertification desire was a

genuine one and was objectively supportable even before Hankinson drove Williams around. But this is a credibility question, and the ALJ decided that there were not enough signatures before that time. No reversible error occurred here.

13.  William Penn Nursing Center (Beverly III)

   William Penn management found out that a union campaign was underway, and it reacted quickly with a wage increase. The Board found that this violated sec. 8(a)(1), as a benefit offered to sway the voters. Beverly retorts that the wage increase was approved by human resources representative Ray Martinez before Martinez knew about the union campaign. But Martinez offered this explanation to the ALJ, who did not believe him. It is worth noting, incidentally, that the ALJ and Board did not find the wage increase itself to be a violation; the violation was in making the announcement on a date timed to bolster the employer's effort to undercut the Union's organizational efforts.

   Beverly also raises a second challenge related to William Penn, to the Board's finding that it violated sec. 8(a)(1) there by creating the impression of surveillance. An employee, Polly Black, visited a co-worker's home one evening to discuss the Union. The next morning, facility administrator Kenneth Horvath greeted her with "Good morning, Mrs. Black, I understand you had a busy night last night," and asked her to meet with him later. The Board, overruling the ALJ, found that this incident created an unlawful impression of surveillance. Black had also testified that Horvath's use of the more formal "Mrs. Black" instead of "Polly" created a cold impression. The Board was within its rights to conclude that a statement implying that the administrator was keeping an eye on Black's off-hours, off-premises conduct created an impression of surveillance that was impermissible. Once again, the fact that this incident can be seen in a more innocuous light is not enough to win the day for Beverly.

14.  Greenwood Health Center (Beverly III)

   At Greenwood, employee Louis Saez, in his capacity as Union delegate, filed a grievance with the facility director of environmental services, Robert Flynn, complaining about disrespectful treatment of employees by supervisors. Instead of meeting with Saez as requested, Flynn questioned other employees about the grievance and held a meeting at which he discussed it. He gave Saez no advance notice of

the meeting, and refused to address Saez in his capacity as Union delegate. The ALJ, and then the Board, found that Flynn violated sec.sec. 8(a)(5) and (1), first by interrogating the employees directly about the grievance rather than by going through or including Union delegate Saez, and then by having a grievance meeting without proper notice to the Union representative.

Beverly argues that there was no refusal to bargain because Flynn was just "speaking" to the employees, not negotiating a settlement of the grievance. And, even though Saez did not know about the meeting in advance, there was a meeting--a sort of no harm, no foul argument. These points do not persuade us to overturn the Board's findings. There was a specific procedure to follow with grievances, and Beverly did not follow it. Instead, it tried to cut the Union out of the process in an impermissible way that violated sec. 8.


15.   Deltona Health Care Center (Beverly III)

Here, facility administrator Kantarze put up a poster supporting management just outside her office. The poster proclaimed, "We want to give new management a chance. We don't need a union now." Kantarze had all the department heads sign the poster; below their signatures was some blank space. Dozens of employees signed the poster in that space. The Board found that the poster amounted to a violation of sec. 8(a)(1) because it pressured the employees to indicate their Union sentiments. Beverly responds that there was no coercion or interference involved either in the posting or in the implicit invitation to "sign on" to the anti-union sentiments.

An employer may hand out anti-union paraphernalia, like coffee mugs with "vote no" on them, without violating the Act. Circuit City Stores and Limited Food & Commercial Workers, 324 NLRB 147, 147 (1997). Even so, an employer may not pressure the employees into making an observable choice about the Union that indicates rejection or support. Id. The Board found that the act of hanging the poster was coercive and pressured the employees into revealing their preferences. This is a question of judgment and workplace dynamics, and we cannot say that the Board's inferences were unreasonable. The Board could have inferred from the public nature of the display that employees who did not wish to sign or who had not signed yet were subtly coerced.


16.   East Moline Care Center (Beverly III)

Both SEIU and Beverly challenge aspects of the Board's decision with respect to the East Moline facility, but we find on both sides of the aisle that the Board acted within its discretion and its findings were supported by substantial evidence.

East Moline's employee manual states that the facility bulletin boards are solely for use by management to post official communications. During the Union campaign, an employee posted an anti-union poster on a facility bulletin board. A pro-union employee complained to the director of nursing, Jordan, who dismissed his complaint with the comment that he was entitled to his own opinion. The Board found that Beverly violated sec. 8(a)(1) by the discriminatory enforcement of the rules regarding access to the bulletin boards.

Beverly argued that it never enforced the bulletin board rule against pro-union employees, and thus there was no disparate enforcement. But the Board could have concluded that the fear of Beverly's enforcing the rule against them was enough to chill pro-union employees from putting (unauthorized) things on the boards. There was no evidence offered to show that anyone else had been allowed to post notices on the bulletin boards before the anti-union message appeared, and so the pro-union employees had no reason to hope that they would be exempted from enforcement of the rule.

The day before the election, the company held a mandatory employee meeting to discuss the Union. It posted guards at the facility entrances during the meeting. Also, during the election itself the company posted guards at the facility entrances closest to the voting areas and required employees to show identification to use those entrances. The Board found no justification for this show of force and concluded that it served only to disparage the Union and its supporters. Beverly tried to suggest that during all-staff meetings and during the election, when much of the staff is away from patients, greater security is necessary for the sake of the patients. But it introduced no evidence indicating that it had such concerns for the patients in analogous situations when the Union element was missing. There was enough evidence here from which the Board could infer a violation.

The Board also rejected some charges with respect to East Moline, and it is these that SEIU attacks. First, the Board found that the discharge of employee Dorothy Theunick two days before the election was not an unfair labor practice. It found that the discharge was

inspired in part by anti-union animus, but that Theunick would have been fired no matter what. She had been absent for four days, and upon her return, she falsified the date on an old doctor's note to explain her absence. After her discharge, she attempted to give the facility administrators another note, but they refused to take it. The Board was entitled to conclude that falsifying a doctor's note was serious enough to warrant firing.

The Union also argues that the remedy in East Moline should have been a Gissel bargaining order--that is, an order requiring immediate bargaining rather than a new election. The ALJ had ordered Beverly to bargain with the Union based on its earlier showing of majority support through signed authorization cards. He did so because he believed that the posting of the guards, the disparately enforced no-solicitation rule, and an administrator's statement that he would see the place sold before it got a union so tainted the workforce that a new fair election would not be possible. The Board reversed, finding that the company's conduct was not so egregious or longstanding to warrant this admittedly extreme remedy.

As noted, a bargaining order is an appropriate remedy only if the challenged practices are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." Gissel Packing, 395 U.S. at 614. The Union offers no good reason why a new election would not suffice here. The fact that one administrator made ominous remarks is not necessarily enough, especially since he was not a regional official and the record does not indicate that his views carried special weight with the employees. The Board reasonably decided to allow traditional remedies to do their job, rather than to impose the Gissel order.

17. Park Haven Center (Beverly III)

At Park Haven, facility administrators refused to furnish the attendance and disciplinary records of the non-Union employees to the Union. The Union wanted these records because it was concerned that unit employees were being treated differently from their non-unit counterparts. The Board found that the Union had a valid reason to request the records and that Beverly's refusal to turn them over violated sec.sec. 8(a)(5) and (1).

Although Beverly argues that the information could not have been relevant to the Union, because non-union employees were subject to a

different tardiness policy, its very defense shows why the Union needed the records. What exactly was the non-union tardiness policy? Were the differences material to the way in which each group was treated? The Union had the right to explore these issues for itself, rather than taking Beverly's word for it, and for that reason, the Board's decision is supported by substantial evidence.

   18.  Garden Terrace Nursing Center (Beverly III)

   During a union campaign, employee Toni Oman was on a break in the shower room discussing the Union with employee Tommie London. Facility personnel supervisor Karen Goodson Henry came in, heard the conversation, and told them that "somebody could get in trouble" for such a discussion. Beverly reads this as a simple reference to Garden Terrace's policy that employees could not solicit Union support in customer care areas, but the ALJ and Board thought that it had more ominous overtones, such as the insinuation that one could get into trouble for discussing the Union at all. If that is what it was--and the Board was entitled to construe it that way--then it was a coercive attempt to get the employees not to join the Union and it thus violated the Act.

   At three captive audience meetings held by Garden Terrace facility personnel, facility management explained their anti-union views. They then called on three CNAs, including London, to speak, and each of them also expressed anti-union views. London also talked about the possibility of the employees' forming their own group or union to deal with management. The Board found that London was at that time acting as an agent of Garden Terrace.
   If Garden Terrace managers had encouraged an independent union (as London seemed to be doing), they would have violated sec. 8(a)(1), because employers must remain neutral. See NLRB v. Wagner Iron Works, 220 F.2d 126, 138 (7th Cir. 1955). The key issue is therefore whether the Board's conclusion that London had actual or apparent authority to speak as Garden Terrace's agent is supportable. While we see this as a close call, close calls go to the Board under the applicable standard of review. The managers called on London; London was known to be anti-union; and the Board could have concluded that the managers were trying to use her for a job that they knew they could not do themselves.

   19.  Gulf Coast Convalescent Center (Beverly

III)

At Gulf Coast, management approved an across-the-board wage increase for the employees in 1992. Regional director of human resources Alvin Taylor decided to delay the increases to certain personnel when he found out that there was a campaign underway to organize them. For other employees, he approved the wage increases right away. Taylor testified that he was afraid that giving a raise during the organizational campaign would open Beverly up to charges of unfair labor practices. Instead, the Board found that Taylor's delay of the raise was an unfair labor practice. Several factors persuaded it to discredit Taylor's alleged dilemma. First, it found that the wage increase had already been approved prior to the start of the campaign and was sorely needed. Second, it found anti-union animus because the company told the employees that the delay was the fault of the Union. Third, immediately after the Union was defeated, the facility implemented the wage increase--a step that the Board saw as reinforcing the message that the Union was to blame for the delay.

Particularly the first of those factors persuades us that the Board's decision passes muster. If the increase was already approved, then implementing it after the start of the campaign should not have resulted in an unfair labor practice charge. Or, as happened with another facility, Beverly could have tried to work out an arrangement under which it could give the raise in exchange for the Union's agreement not to complain. Harping on the Union's responsibility for the "delay" in the midst of the campaign was also out of line, and also supports the Board's conclusion.

20. Northcrest Nursing Home (Beverly III)

Last are the problems the Board found at Northcrest. The day prior to the election there, as had happened in some other places, the facility managers held a mandatory union meeting. At this meeting, unlike earlier ones that had been held, the managers did not intend to answer questions; apparently they wanted only to lecture on their views to the employees. Instead, however, after Chambers (regional director of human resources) began to speak, employee Julie Schriner spoke up in a loud voice, asking if she would get a chance to ask a question. Her intervention disrupted the meeting. Rodger Brown, Beverly's corporate director of associate relations, told her to sit down and that questions were not permitted. He did not mention to Schriner or the assembled group that he also

wanted to finish the meeting quickly so that everyone could return to their work stations.

Schriner continued to interrupt until she was threatened with suspension and asked to leave. Northcrest made good on the threats and suspended her for three days without pay. The Board found that Brown overreacted in a way that was designed to chill both Schriner and the other employees in the upcoming election, and that this was a violation of the Act.

An employer has the right to deliver a non-coercive anti-union speech. Livingston Shirt Corp., 107 NLRB 400, 406 (1953). Unions are not entitled to use a medium of communication simply because the employer is using it. NLRB v. United Steelworkers, 357 U.S. 357, 363-65 (1958). Finally, as Beverly points out, employers are certainly entitled to maintain order and respect in the workplace. NLRB v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965).

Beverly says that Brown was doing nothing more than he was entitled to do under those principles, and furthermore that he was just trying to move the meeting along. But he never said a word about the latter goal. And as for the former, it would have been easy to have told Schriner that the time for asking questions would be right after the meeting, which turns out to be when everyone else asked questions. Instead, he decided to tell Schriner to shut up and sit down. While this may have been motivated solely by a "law and order" rationale, the Board was entitled to conclude that it was designed to silence a vocal Union advocate (as Schriner was known to be). Once again, given the deferential nature of substantial evidence review, we see no reason to reverse this finding.

IV

We turn finally to the Board's remedy in this case: a company-wide cease-and-desist order, coupled with a posting requirement and a laundry list of forbidden activities. We give special deference to the Board's choice of a remedy, because of its expertise. Gissel Packing, 395 U.S. at 612 n.32. Nevertheless, the Board must restrict itself to orders that "effectuate the policies" of the Act. 29 U.S.C. sec. 160(c); see also Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540 (1943). The scope of an order is not overly broad where the Board might reasonably have concluded from the evidence that such an order was necessary to prevent the employer from continuing to engage in unfair labor practices. May Dept. Stores Co. v. NLRB, 326 U.S. 376, 390 (1945).

Factors that are helpful in deciding whether an order is too broad include (1) the number of violations as compared to the number of unaffected parties and facilities, (2) the types of violations, (3) the corporate control over, or causation of, the unfair labor practices, and (4) the publicity of the unfair labor practices among the employees. See Torrington, 17 F.3d at 586; Blount Brothers Corp. v. NLRB, 571 F.2d 4, 4-5 (7th Cir. 1978). As is true for most multi-factored laundry lists, this one does not tell us which factor counts for more than the others, or how to break the tie when some tend one way and others the opposite way. But they help to structure analysis, even if they do not produce mathematical results, and in the end the choice of a proper remedy is a highly contextual one that does not lend itself to easy formulae.

In Blount Brothers, this court found that an isolated incident involving one out of 1,000 employees did not support a sweeping order prohibiting the employer from violating the Act "in any other manner." 571 F.2d at 4. Beverly argues that this might as well be that case: it runs 895 nursing homes, and from 1986 to 1993, the Board found that it had committed approximately 220 unfair labor practices in 54 of those homes. That works out to 6%--not nearly as low as 0.1%, of course, but still a small proportion (yet 60 times greater than the number we dismissed in Blount Brothers). But, as is often the case, there are quite a few ways to crunch those numbers, which leaves us feeling that they are not ultimately too helpful. For example, the Board points out that only about 10% of Beverly's facilities (between 90 and 100) have unionized employees. In Beverly II and Beverly III combined, it committed unfair labor practices at approximately 15% of those facilities. Or, looked at another way, it committed unfair labor practices during the course of two out of the five representation elections that took place in 1990, or 40% that year. Or perhaps the best numbers take a more global view: in Beverly III, a total of eight corporate or regional officials committed 14 violations, at five facilities, during organizational campaigns.

As of the time the Second Circuit decided Torrington, it concluded that the record did not support a corporate-wide order because the violations were not serious enough and the record did not provide enough evidence of a corporate-wide policy that was leading to the commission of unfair labor practices. But, as both the Board and the two ALJs here pointed out, the record now before us is a far richer one. The Board was entitled to conclude, especially after specific

remedies in Torrington did not appear to stop the efforts from the company's central management to stop unions in any way possible, that the time was past for piecemeal relief. Some of the unfair labor practices here were extremely serious, such as the threat to sell the facility in East Moline; others struck at the heart of the collective bargaining relationship, such as those in which facility managers refused to give unions necessary information; some looked more like isolated incidents, serious enough to punish but not likely to poison the workplace for the long term. As a whole, however, it was not a good record.

Perhaps the fact that most strongly supports the Board's chosen remedy, however, is the ubiquitous nature of the area personnel at local facilities whenever labor problems arose. In case after case, at facility after facility, the Board saw regional managers coming in to ensure that Beverly's overall corporate policy was implemented. In itself, there is nothing wrong with central organization, but in this instance the Board was entitled to conclude that nothing less than a corporate-wide order would do the job of correcting the proclivity this company has shown for committing or tolerating unfair labor practices at a significant number of its facilities. The specific order it entered, however, is problematic. We are concerned that much of it is nothing more than a laundry list of the particular violations committed at individual facilities. There is no reason, for example, for the corporate-wide order to devote two paragraphs to Julie Schriner's situation (and she is there in the order by name). We do not consider it appropriate to go through the order in the first instance and decide which parts are properly directed to the corporation as a whole and which to particular facilities. We leave this task to the Board on remand. Given Beverly's recidivism and the corporate direction the Board has found pervading its handling of union complaints, the Board is entitled to impose corporate-wide relief. But this should be supplemented with relief directed to the individual facilities, for instances in which the violation does not have significance beyond them.

For the reasons stated, the order of the Board is Enforced in part and Vacated in part, and the cases are remanded to the Board for further proceedings consistent with this opinion. Costs on appeal shall be taxed against Beverly.